NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GRANITE STATE MINERALS,
INC., Respondent.

No. 81–1346.

United States Court of Appeals,
First Circuit.

Argued Nov. 2, 1981.

Decided March 23, 1982.

Linda B. Weisel, Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John G. Elligers, Washington, D. C., were on brief, for petitioner.

Richard W. Gleeson, Boston, Mass., with whom Stoneman, Chandler & Miller, Boston, Mass., was on brief, for respondent.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The issues in this case arise out of a union representation election held under an NLRB "consent" procedure. That is to say, the election was to be run according to the terms of a Stipulation agreed to by Granite State Minerals (the "Company"), Local 1947, International Longshoremen's Association (the "Union"), and the Board. The Board found that the Union won the seven-vote election by four votes to three. But, the Company objected that the election was run improperly; it refused to recognize the Union; the Board consequently found it guilty of an unfair labor practice; and the Board brings this petition for enforcement. We refuse to enforce the Board's order because we believe both of the Company's objections to the election are valid.

1. The Company first objects to certain changes the Board made unilaterally in the terms of the Stipulation. The Stipulation provided that all employees in the bargaining unit would vote in the Company's garage in Portsmouth, New Hampshire, on May 9, 1980. On May 1, however, the Board learned from the Union that one employee, Ronald Nadeau, would be in Wisconsin at "crane school" on May 9. After confirming this fact with the Company, the Board allowed the Union to drive Nadeau to the Board's Boston office on May 2 and to cast his vote there one week early. The Company consistently objected to this departure from the literal terms of the consent agreement.

■ While no one denies that, as a general matter, the Board has broad discretion to determine the conditions for conducting representation elections, *NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946); *NLRB v. Morgan Health Care Center, Inc.*, 618 F.2d 127, 128 (1st Cir. 1980), we here deal with an election held under a consented-to stipulation. This fact narrows the Board's discretion significantly for it would be manifestly unfair to allow the Board to obtain all the procedural advantages that flow from gaining the other parties' consent yet to excuse it from living up to its part of the bargain. Thus, a party "is entitled to insist that the Board and all parties adhere to provisions of the election stipulation that are designed to ensure a fair election." *Summa Corp. v. NLRB*, 625 F.2d 293, 296 (9th Cir. 1980). As we have written, "the relevant legal standard is whether any breach in the stipulation was sufficiently prejudicial or sufficiently material to warrant setting the election aside." *New England Division of Diamond International Corp. v. NLRB*, 646 F.2d 1, 3 (1st Cir. 1981).

■ In this instance, regardless of whether the Company has proved actual prejudice, *cf. Summa Corp. v. NLRB*, 625 F.2d at 296 n.2, the potential for prejudicing the election was great enough and the terms important enough to make it improper for the Board to have changed those terms and then proceeded with the "stipulated" election. First, it is undisputed that the Company intended to begin an election "campaign," consisting of low-key interviews with the employees in the week of May 2. While one Company supervisor spoke to Nadeau on May 2, the opportunity for the Company to present its case to him and for him to think about it and discuss it with others was curtailed, at least arguably to the disadvantage of both. *See NLRB v. Colvert Dairy Products Co.*, 317 F.2d 44, 46 (10th Cir. 1963); *NLRB v. Lenkhurt Elec-*

*tric Co.,* 438 F.2d 1102, 1108 (9th Cir. 1971). Second, the Board's election notices, mailed on April 30, had not yet been posted by May 2. These notices, provided for by the Stipulation, make clear that the Board is neutral, that it "does not endorse any choice in the election," and that the employee is completely free to accept or to reject the Union. Nadeau had no opportunity to see them. *Cf. Thermalloy Corp.,* 233 N.L.R.B. 428, 429 (1977). Third, any consequent harm was aggravated by the fact that, instead of Nadeau making his own way to a poll, held on the Company's premises and clearly organized by the Board, Nadeau was driven to a special voting place by a union representative who had arranged for Nadeau to vote separately in the Board's offices. Whatever advantage or "neutrality" the Company saw in its agreeing to the Stipulation's voting conditions was turned on its head by this set of events, which could have suggested a "special" relationship between Union and Board. Fourth, the Company felt that it was unable to provide at such short notice "non-supervisory employees" as observers; it rejected the offer to have its lawyers observe; hence Nadeau's balloting took place without Company observation. Moreover, there is no evidence in the record that the Company was at fault in bringing about this situation by deliberately sending Nadeau to Wisconsin at election time. Rather, the Company had been trying for two years to place employees at this school; it learned of openings for a May session in late April; attendance at the school was viewed as primarily for Nadeau's benefit; and it was voluntary on his part.

The ALJ recognized these features, which indicate that the Stipulation's breach was an important one, but he found an offsetting factor in the importance of guaranteeing Nadeau "his right to vote." To weigh this undoubtedly important factor against the others, however, misses the point. The issue is not whether the election was to be held with or without Nadeau, it was whether the NLRB could proceed with a *stipulated* election, changing important terms in the agreement without the Company's consent. In order to secure Nadeau's participation,

the Board could have sought the employer's agreement for a mail ballot or for postponing the election until his return. Had it failed to obtain the Company's consent to any reasonable arrangement providing for Nadeau's participation, it might have had strong grounds for refusing to go forward with the election as stipulated and to have ordered an election with different conditions on fair terms over the employer's objection. Indeed, the Board has recognized that "unusual circumstances or newly discovered facts may warrant the rescheduling of an election." *Versail Manufacturing Co., Inc.,* 212 N.L.R.B. 592, 593 (1974). But we do not have before us a case in which the Board explored with the employer other reasonable alternatives or sought to order a new election on grounds of lack of adequate opportunity to participate. *See NLRB v. W. S. Hatch Co., Inc.,* 474 F.2d 558, 560–61 (9th Cir. 1973). Rather, here the Board proceeded with a stipulated election breaching a material term in that stipulation. That it could not do. *New England Lumber Division v. NLRB, supra; Summa Corp. v. NLRB, supra.*

2. The Company also contends that the NLRB inadequately investigated and wrongly failed to provide a hearing about its claim that an employee was coerced to vote for the Union by threats. It is established that if there is significant evidence presented to the Board's Regional Director suggesting that there has been objectionable conduct which affected the election, the Director must investigate, examining the evidence carefully. *Electronic Components Corp. v. NLRB,* 546 F.2d 1088, 1092 (4th Cir. 1976). Where the evidence calls for it, he should "communicate with the witnesses, question them about the specified events, and follow up any leads developed." *Id.* at 1093. And, a hearing is required if there is enough evidence of "the existence of 'substantial and material factual issues,'" which, if resolved in [the Company's] favor would require the setting aside of the representation election." *NLRB v. Bristol Spring Manufacturing Co.,* 579 F.2d 704, 706–07 (2d Cir. 1978). Under these established stan-

dards, the Company's contention, on the basis of the record before us, is correct.

The Company submitted to the Regional Director a detailed affidavit of one of its employees which said (1) another employee—Employee A as he is called in the Regional Director's Report—had told the affiant that he had received a threatening phone call, (2) Employee A's brother also told the affiant that someone told Employee A that if he did not vote for the Union, he should not show up for work the next day, and (3) when Employee A was asked for more details, he said that "the old cow had smartened up now and wasn't going to say anything more." The Regional Director's investigation of this matter evidently consisted of asking Employee A if he had been threatened and asking an unnamed person at the Union if the Union had threatened Employee A. Not surprisingly, both answered "no."

■ Given the fact that Employee A's negative response is consistent with his "smart cow" remark, common sense suggests that the Director ought to have gone on to ask Employee A if he had ever spoken of threats or made the other remarks mentioned in the affidavit and asked him to explain statements to the contrary. The Director should also have asked Employee A's brother about what he heard. Given the conflicting statements about the matter, a hearing was called for, at least in the absence of a somewhat more detailed, negative preliminary investigation. Instead, the Director and the ALJ rested their conclusion in large part upon the ground that there was no evidence that the *Union* had made any such threat. This court has specifically held, however, that where coercion threatening the freedom of an election is at issue, it does not matter "whether coercive acts are shown to be attributable to the union itself." *Cross Baking Co. v. NLRB*, 453 F.2d 1346, 1348 (1st Cir. 1971). Given the small number of persons in the bargaining unit, the closeness of the vote, the consequently likely importance of a single coercive threat, and the detailed nature of the evidence suggesting the threat, we believe that either a more detailed investigation or a hearing was called for. *See Monmouth Medical Center v. NLRB*, 604 F.2d 820 (3d Cir. 1979).

*For these reasons, the Board's petition to enforce its order is denied.*