## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## NEWLY WEDS FOODS, INC., Respondent.

### No. 84–1513.

United States Court of Appeals, First Circuit.

Argued Dec. 3, 1984.

Decided March 26, 1985.

---

6

P. Dawn Sikkema, Washington, D.C., with whom Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Wiford W. Johansen, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Elliot Moore, Deputy Associate Gen. Counsel, Washington, D.C., were on brief, for petitioner.

Richard A. Perras, Boston, Mass., with whom Ruth Heller-Schaber, Providence, R.I., and Edwards & Angell, Boston, Mass., were on brief, for respondent.

Before COFFIN and BREYER, Circuit Judges, and MALETZ,* Senior Judge.

BREYER, Circuit Judge.

The National Labor Relations Board asks us to enforce an order requiring Newly Weds Foods, Inc., to bargain with Local 348, Bakery, Confectionery and Tobacco Workers International Union, AFL–CIO. *See* 29 U.S.C. § 158(a)(1), (5). The order rests upon a determination by the Board's Regional Director (affirmed by a three-member panel of the Board) that the union won a hotly contested representation election by a vote of 17–16. Newly Weds challenges this determination, pointing to certain features of the election that, in its view, invalidate the result. Having read the record and considered Newly Weds' arguments, we conclude that the Board's rejection of Newly Weds' challenge was within its lawful powers; and we enforce the Board's order.

I

Newly Weds argues that the Board should not have counted the ballot of Donald McPherson, a company employee who was on indefinite sick leave at the time of the balloting. In deciding whether the

* Of the United States Court of International Trade, sitting by designation.

Board correctly held that McPherson was eligible to vote, we take the relevant facts to be the following:

a. McPherson worked for Newly Weds as a "set-up man"—a job that evidently required him to stand for considerable periods of time.

b. In April 1982, seven months before the election, he injured his foot in a work-related accident, took a leave of absence, and began receiving workers' compensation.

c. McPherson met several times with a rehabilitation counselor who worked for Newly Weds' insurance carrier. But, he stopped meeting with the counselor after the counselor suggested that McPherson accept a lump sum payment instead of reemployment.

d. Two days before the election, McPherson's doctor examined him and told him that he could perform "sitting work," but he could not yet be "released" for work that (like his former job) required extended periods of standing.

e. On the day of the election, McPherson spoke with Rita Sarkissian, a Newly Weds receptionist, in the company's lobby. Sarkissian testified (as reported by the Regional Director) that McPherson told her

> that his foot was getting worse, that it was a permanent injury, that his doctors had told him that it was a permanent injury, and that he could not work for the rest of his life. She asked McPherson if he was planning to return to the [company], to which he replied, "No, I won't come back to Newly Weds."

f. From the time of the accident through the date of the election, Newly Weds kept McPherson on its payroll records; continued his health and life insurance coverage; placed his name on an election eligibility list; mailed campaign literature to him; and allowed him to keep his uniform, tools, and identification card—items that he was obligated to

return if his employment was terminated.

The Board held that, on these facts, McPherson was eligible to vote.

■ The rule governing eligibility under the National Labor Relations Act is that one employed on the election date and on the last day of the preceding payroll period can vote in a certification election. *See Computed Time Corp.,* 228 N.L.R.B. 1243, 1250–51 & n. 31 (1977). The eligibility of an employee on sick leave, however, is determined according to a different standard. According to the Board,

> The general rule regarding employees on sick leave is that they are presumed to remain in that status until recovery, and a party seeking to overcome that presumption must make an affirmative showing that the employee has resigned or been discharged.

Office of General Counsel, *Outline of Law and Procedure in Representation Cases* 284 (1974). The Board held that Newly Weds had not overcome the "presumption" that McPherson was still on sick leave, and thus continued to be an employee for eligibility purposes, because Newly Weds had not shown a "discharge" or "resignation."

■ In our view, the evidence is more that adequate to support this conclusion. The Board could reasonably view McPherson's conversations with a receptionist on election day as neither intended to constitute resignation from the company, nor legally sufficient to do so. *See Akers v. J.B. Sedberry, Inc.,* 39 Tenn.App. 633, 286 S.W.2d 617 (1955) (resignation must be accepted to be effective); *Lemlich v. Trustees of Harford Community College,* 282 Md. 495, 385 A.2d 1185, 1189 (1978) (employee's tender of resignation not effective until accepted by one with authority to make employment contracts); *Restatement (Second) of Agency* ch. 8 at 581 (1958) (introductory note) ("A notification is intended to affect the relations between the parties, and it has that effect only if given to or by an agent who has power to bind the principal under the rules relating to consensual transactions between the princi-

pal and third persons."); *compare Keeshin Charter Service, Inc.,* 250 N.L.R.B. 780, 792–94 (1980) (employer's acceptance of resignation *after* election does not affect eligibility).

The difficult question here, however, is whether the Board's quoted "rebuttable presumption" rule for determining the eligibility of 'sick leave' employees—which appears in a manual that the Board does not consider binding precedent but only "a reflection of Board decisions"—is in fact the standard that the Board applies. Newly Weds claims that the rule generally applied by the Board is that 'sick leave' employees are eligible to vote only when they have a "reasonable expectation of returning to work." *See, e.g., Price's Pic-Pac Supermarkets, Inc.,* 256 N.L.R.B. 742, 743 (1981). Newly Weds adds that McPherson's conversation with the receptionist shows that he had no expectation at all of returning.

We have examined the Board's decisions and related court cases in an effort to determine what standard the Board, in fact, has applied, and whether it has acted inconsistently, applying different standards at different times, to the prejudice of those who appear before it. *Cf. Sunbeam Television Corp. v. FCC,* 243 F.2d 26 (D.C.Cir. 1957). We have found a surprising lack of uniformity in the relevant materials, with some cases speaking of "reasonable expectations," *see, e.g., NLRB v. New England Lithographic Co.,* 589 F.2d 29, 32 (1st Cir. 1978); *Price's Pic-Pac Supermarkets, Inc., supra; Cato Show Printing Co.,* 219 N.L.R.B. 739, 754 (1975), some referring to a "presumption" of employment in the absence of communicated termination, *see, e.g., NLRB v. Staiman Brothers,* 466 F.2d 564, 566 (3d Cir.1972); *Miami Rivet Co.,* 147 N.L.R.B. 470, 483 (1964); *Wright Manufacturing Co.,* 106 N.L.R.B. 1234, 1236–37 (1953), and some speaking of both, *see, e.g., NLRB v. Adrian Belt Co.,* 578 F.2d 1304, 1308 (9th Cir.1978); *Whiting Corp.,* 99 N.L.R.B. 117 (1952). Respected commentators also differ in their descriptions of the standard. *Compare* R. Gorman, *Basic Text on Labor Law* 43 (1976) (em-

ployees on sick leave may vote if they have a "reasonable expectation of reemployment") *with* 1 *The Developing Labor Law* 385–86 (C. Morris ed. 1983) ("reasonable expectation" test applies to *laid-off* employees; "[e]mployees on sick leave ... are eligible to vote if they are to be automatically restored to their duties when ready to resume work").

■ Nonetheless, we have found a basic coherence in the Board's approach—a coherence that it explained in *Whiting Corp.,* 99 N.L.R.B. 117, *rev'd* 200 F.2d 43 (7th Cir.1952), as follows:

Under the Board's practice, an employee on sick leave ... is eligible to vote in an election. Despite their not working, such individuals retain their employment status and are therefore considered to have sufficient interest in the outcome of the election to be permitted to vote. Sometimes it is difficult to ascertain whether an employee ... has lost or retained his status as an employee. In such cases, the Board applies the "reasonable expectation of further employment" standard *as an aid* in resolving the question. When the retention of [the] employee's status is clear, as we have found it to be in this case, the Board does not make further inquiry as to the expectation of future employment. Employee status having been established, the right to vote is similarly established.... This rule may not be a perfect one to determine eligibility, but in the Board's opinion it is the only practicable one, if election results are not to be held back by endless investigations into states of mind or of future prospects.

99 N.L.R.B. at 123 (citations omitted) (emphasis added). According to this standard, the Board uses the "reasonable expectations" of 'sick leave' employees only to clarify ambiguities of employment status. The administrative need for such a standard is sufficiently plausible to support the conclusion that this rule lies within the agency's statutory powers. *See NLRB v. Boston Beef Co.,* 652 F.2d 223, 226 (1st Cir.1981); *NLRB v. Fenway Cambridge*

*Motor Hotel,* 601 F.2d 33, 36 (1st Cir.1979); *NLRB v. S. Prawer & Co.,* 584 F.2d 1099, 1101 (1st Cir.1978).

■ This clarification of the Board's rule does not help Newly Weds; for even if we view McPherson's "status" as ambiguous, his conversation with Sarkissian does not compel a finding by the Board that he was ineligible to vote. McPherson's "status" with the firm is a matter of its employment practices—how it considers or classifies him. Initially, it classified him as on "temporary leave." Even if McPherson began to believe his injury was more serious, the Board could reasonably find that his subjective belief (at most, communicated to a receptionist) was insufficient to change that status. (Suppose McPherson had changed his mind the day after he talked to the receptionist. Would—or could—Newly Weds have said, "No, you can't come back, you left the company"?) In sum, the record adequately supports an eligibility finding under the test that the Board has set out in its Manual and explicated in *Whiting Corp., supra,* as the rule governing the eligibility of "sick leave" employees.

The matter is complicated still further, however, by the fact that the Seventh Circuit refused to enforce the Board's order in *Whiting Corp.* It wrote (ignoring the Board's own statement of its rule) that "the Board's own decisions" establish that "whether one is an employee is a question to be determined by his reasonable expectation of employment within a reasonable time in the future." 200 F.2d at 45 (citations omitted). The court went on to hold that the employee in question had no such "reasonable expectation" because he had severe arthritis, his doctor had told him to quit work, he had told many fellow employees that he would retire, and his specific immediate reason for leaving work—his wife's illness—continued unabated. Moreover, there are certain factual similarities between this case and *Whiting Corp.*

Nonetheless, the Seventh Circuit's holding in *Whiting Corp.* does not require a holding in Newly Weds' favor here. For one thing, the Seventh Circuit did not directly overturn the Board's rule. Rather, court and Board in that case simply passed like ships in the night. The court assumed that the Board had applied a general "reasonable expectations" rule; and it reviewed the case under that rule. It did not seem to realize that the Board in fact applied a special "sick leave" exception. For another thing, the court's holding, read in light of the special "rebuttable presumption" test that the Board actually applied, suggests at most that *clear* objective evidence of no "reasonable expectation" of return to work "rebuts" the presumption of continued "employment status." Here, however, the evidence is not clear. McPherson's statement to Sarkissian could mean either that McPherson did not intend to return or that, as a predictive (and here uncertain) matter, he did not think he would be able to obtain a medical release to perform his former job. The meaning of McPherson's decision to discontinue the rehabilitation counseling is also ambiguous, suggesting either that he thought rehabilitation hopeless, or that he disagreed with the counselor's suggestion that he take a lump sum termination payment. As we have said, the Board did not have to conclude from this evidence that McPherson's temporary 'sick leave' status had changed.

Despite disparate and sometimes ambiguous language, the cases are consistent with the Board's statement of its "rebuttable presumption" rule. And, as we have said, the evidence is sufficient to show eligibility under that rule. We conclude that the Board had adequate legal power to reject Newly Weds' challenge to McPherson's eligibility.

II

Newly Weds also argues that a "threat" of violence invalidated the election. A Newly Weds employee testified that, two months before the election, Jim Webb (a fellow employee) asked him if he intended to sign a union authorization card. He asked Webb what would happen if the union called a strike and the company hired

replacements. Webb said that anyone who tried to cross the picket line would be "beat up" and "heads would be busted." The employee said he "felt threatened by this remark."

 The issue for the Board was "whether an atmosphere of fear and coercion was created" to the point where a free and fair election was not possible. *Cross Baking Co. v. NLRB*, 453 F.2d 1346, 1348 (1st Cir.1971); *see also NLRB v. Morgan Health Care Center, Inc.*, 618 F.2d 127, 128–29 (1st Cir.1980). Since the evidence of coercion consists only of this single statement, the record is more than adequate to support a Board conclusion that the election was free and fair. Moreover, unlike *NLRB v. Granite State Minerals, Inc.*, 674 F.2d 101 (1st Cir.1982), on which Newly Weds relies, the Regional Director in this case investigated the matter, and the company has presented no further evidence suggesting that the investigation was inadequate.

Newly Weds' strongest argument with respect to this "coercion" issue is that the Board used the wrong legal standard in determining whether Webb's remarks prevented a free election. The Regional Director gave three separate reasons for concluding that the "threat" did not invalidate the election. First, he said that the speaker was not a union agent. Second, he said that the Board had found such remarks might just as easily persuade employees to vote against the union. And, third, he said the following:

> I find that [Webb's] remarks do not provide a sufficient basis for setting aside the election. Thus, his remarks do not involve any threats toward employees based upon how they would vote in the election. Further, Webb's remarks do not relate to events surrounding the election and were not calculated to coerce employees into voting for the [union]. It is also evident from the context of the remarks that they did not relate to a possible strike prior to the election, but rather, were made only in reference to some unspecified time in the future, af-

ter the [union] had become the employees' bargaining representative and a strike was called. Therefore, as the alleged remarks were unrelated to the election, they could not have had the effect of coercing employees into voting in a particular manner and, accordingly, could not have affected the outcome of the election. *Beaird-Poulan Division, Emerson Electric Company*, 247 NLRB 1365 (1980), enfd. 649 F.2d 589 (C.A.8, 1981); *Burris Chemical, Inc.*, 246 NLRB 205 (1979).

 We agree with Newly Weds' contention that the first two of these reasons cannot support the Board's conclusion on this issue. One employee's remark to another *can* be coercive even though the speaker is not a union agent. *See NLRB v. Granite State Minerals, Inc.*, 674 F.2d at 104 ("[W]here coercion threatening the freedom of an election is at issue, it does not matter 'whether coercive acts are shown to be attributable to the union itself'") (citations omitted); R. Gorman, *Basic Text of Labor Law* 47 (1976) (similar). Newly Weds is also correct in pointing out that the Board no longer adheres to the view that remarks like Webb's can be considered harmless because they might have a greater tendency to hurt the union than to help it. *See Home and Industrial Disposal Service*, 266 N.L.R.B. 100, 101 (1983), *overruling Hickory Springs Manufacturing Co.*, 239 N.L.R.B. 641 (1978).

 We do not agree, however, with Newly Weds' argument that the Regional Director's third reason must be rejected. Newly Weds contends that the Regional Director was plainly wrong, as a matter of law, in stating that "remarks ... unrelated to the election ... *could* not have the effect of coercing employees into voting in a particular manner and, accordingly, *could* not have affected the outcome of the election" (emphasis added). Newly Weds is perhaps correct in this last argument as a matter of logic. Threats unrelated to a particular election *can*, in some circumstances, coerce where "such threats ... have a substantial and destructive effect

on free and open campaign discussion, as well as freedom of choice at the polling place itself." *Home and Industrial Disposal Service*, 266 N.L.R.B. at 101. But the Regional Director's remarks, read in light of the record and in the context of his entire opinion, indicate to us that he meant that these 'unrelated threats' could not have affected (and did not affect) *this* election in light of the circumstances that he mentioned. To read the opinion otherwise is to engage in a type of literalism that overlooks the context and the evidence—that focuses on logical possibilities rather than practical likelihood. To remand to allow the Board or the Regional Director to say explicitly that they meant the threat was insufficient here to create an atmosphere of coercion would waste the time of the Board and the parties, and create unnecessary delay. And such delay, by itself, can undermine the purposes of the Act. *See generally* Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA*, 96 Harv.L.Rev. 1769, 1795–97 (1983). In our view, the Regional Director and the Board simply meant that, in context, the evidence did not show sufficient coercion. And, the record plainly supports that conclusion.

### III

Newly Weds raises several other issues that we treat more summarily.

a. The company's election observer testified that, just before an employee's brother entered the voting booth, she heard the employee say to this brother "just yes" as the employee pointed to the "yes" box on the sample ballot. She added that

> as soon as the [employee] began speaking, the Board agent conducting the election sprang to her feet and immediately ushered him out of the polling area. The Board agent then instructed the ... brother on the mechanics of voting and emphasized that he had the option of marking either the "Yes" square or the "No" square on his ballot. The ... brother then cast his vote in secret.

Newly Weds argues that even though this last-minute electioneering was not done by the union itself and therefore does not run afoul of the Board's *per se* rule against such activity by a *party* to the election, *see Milchem, Inc.*, 170 N.L.R.B. 362 (1968), the employee's conduct nonetheless violates the *policy* underlying the *Milchem* rule and the general rule against electioneering at or near the polls in representation elections. *See Claussen Baking Co.*, 134 N.L.R.B. 111 (1961). In *Milchem*, the Board stated that

> the potential for distraction, last minute electioneering or pressure, and unfair advantage from *prolonged conversations* between representatives of any *party* to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, without inquiry into the nature of the conversations. The final minutes before an employee casts his vote should be his own, as free from interference as possible.

170 N.L.R.B. at 362–63 (emphasis added). The Board also said in *Milchem*, however, that its rule

> does not mean that any *chance, isolated, innocuous comment or inquiry* by an employer or a union official to a voter will necessarily void the election. We will be guided by the maxim that "the law does not concern itself with trifles."

*Id.* (emphasis added).

■ The Regional Director found that, even viewing Newly Weds' evidence "in the light most favorable to the [company]," there was not a sufficient basis here for overturning the election. Given the corrective action that was immediately taken, the fact that the speaker was not a union member or agent (the precise subject of *Milchem*'s rule), and the *Milchem* exception for "isolated, innocuous comment[s]," we find no abuse of the Board's discretion in reaching this conclusion. *See NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946); *Friendly Ice Cream Corp. v. NLRB*, 705 F.2d 570, 580 (1st Cir.1983); *see also Boston Insulated Wire*, 259 N.L.R.B. 1118, 1118 (1982) (in

**12**

considering challenge to alleged electioneering, "the Board seeks to establish election conditions as ideal as possible [but] 'elections must be appraised realistically and practically, and should not be judged against theoretically ideal, but nevertheless artificial, standards' ") (citations omitted).

■ b. The company challenges the Board's refusal to count a ballot that we have reproduced in the Appendix. The company argued before the Board that the ballot "*clearly*" expresses an intent to vote "*no.*" The Board found considerable ambiguity. So do we. *See Kaufman's Bakery*, 264 N.L.R.B. 225 (1982) (stating that Board will "regard a mark in only one box, despite some irregularity, as presumptively a clear indication of the intent of the voter," but that such a presumption would not apply if "irregular markings appear outside the marked box"); *NLRB v. Connecticut Foundry Co.*, 688 F.2d 871, 875–76 (2d Cir.1982) (Board did not abuse its discretion in voiding ballot marked with an "X" in the "Yes" square but with the word "No" written upside down above the "Yes" square). As far as this issue is concerned, one glance at the ballot is worth a thousand words. We find no abuse of discretion in the Board's decision to consider this ballot void.

■ c. The company argues that the Board or the Regional Director should have held an evidentiary hearing on several matters including McPherson's eligibility, the alleged "threat" by Webb, and the "electioneering" incident. The Regional Director, the Board, and this court, however, have assumed the company's version of the relevant disputed factual matters (such as Sarkissian's version of her conversation with McPherson, the employee's account of Webb's alleged "threat," and the company observer's description of the "electioneering" incident) to be correct. *See Melrose-Wakefield Hospital Association v. NLRB*, 615 F.2d 563, 571 (1st Cir.1980). Moreover, the company shows no "substantial and material" issue of fact that would

require a hearing. 29 C.F.R. § 102.69(d) (evidentiary hearing required only "with respect to those objections or challenges which the regional director concludes raise substantial and material factual issues"); *see Baumritter Corp. v. NLRB*, 386 F.2d 117, 120 (1st Cir.1967). Unlike the Regional Director in *Granite State Minerals, supra,* the Regional Director here fully investigated the company's various objections to the election. The Board is vested with broad discretion to determine whether an evidentiary hearing is necessary—*i.e.*, whether a substantial and material factual dispute exists. *See NLRB v. S. Prawer & Co., supra; Solon Manufacturing Co. v. NLRB*, 544 F.2d 1108, 1110 (1st Cir.1976); *Melrose-Wakefield Hospital Association v. NLRB*, 615 F.2d at 571 (mere disagreement with Board's factual conclusions "does not mandate a hearing"). We find no abuse of its lawful powers here.

■ d. Newly Weds argues that employee turnover since the 1982 election warrants a new election given the closeness of the result. This circuit, however, has explicitly held that employee turnover during delay caused by a company's challenge of a representation election is not a proper basis for ordering a new election. *See NLRB v. Magnesium Casting Co.*, 427 F.2d 114, 121 (1st Cir.1970), *aff'd*, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971). We shall not depart from this rule. *Compare NLRB v. Katz*, 701 F.2d 703, 709 (7th Cir.1983) (denying enforcement of bargaining order because of employee turnover during three-year period from time of election to court of appeals decision) *with NLRB v. Patent Trader, Inc.*, 426 F.2d 791, 792 (2d Cir.1970) (en banc) (to allow employee turnover to justify nonenforcement of bargaining order would give an employer an "incentive to disregard its duty to bargain in the hope that over a period of time a union will lose its majority status").

For these reasons, the Board's order is

*Enforced.*

## APPENDIX

UNITED STATES OF AMERICA
ETATS-UNIS D'AMERIQUE
ESTADOS UNIDOS DE AMERICA
MỸ QUỐC

NATIONAL LABOR RELATIONS BOARD
COMMISSION NATIONALE DES RELATIONS DU TRAVAIL
JUNTA NACIONAL DE RELACIONES DEL TRABAJO
BAN QUỐC GIA LIÊN LẠC LAO ĐỘNG

OFFICIAL SECRET BALLOT FOR CERTAIN EMPLOYEES OF
BULLETIN SECRET OFFICIEL POUR CERTAINS EMPLOYES DU
PAPELETA SECRETA OFICIAL PARA CIERTOS EMPLEADOS DE
CHÁNH THỨC BẦU PHIẾU KÍNH CHO MỘT SỐ KHẢN VIÊN CỦA CÔNG TY

KEWLY WEDS FOODS, INC., Watertown, Massachusetts

---

Do you wish to be represented for purposes of collective bargaining by —
Désirez-vous être représenté aux fins de marchandage collectif par —
¿Desea usted estar representado para los fines de negociar colectivamente por —
Ông (hay bà) có đồng ý có người đại diện thài mật cho ông (hay bà) trong cuộc
bầu cử chung không?

LOCAL 348, BAKERY, CONFECTIONERY AND TOBACCO WORKERS INTERNATIONAL UNION?

---

MARK AN "X" IN THE SQUARE OF YOUR CHOICE
METTEZ UN "X" DANS LE CARREAU DE VOTRE CHOIX
MARQUESE CON UNA "X" DENTRO DEL CUADRO DE SU SELECCION
XIN CÁC ÔNG (HAY BÀ) VIẾT CHỮ X TRONG BÌNH VUÔNG MÀ CÁC ÔNG ĐÃ CHỌN

| | |
|---|---|
| YES<br>OUI<br>SI<br>ĐỒNG Ý | NO<br>NON<br>NO<br>KHÔNG ĐỒNG Ý *YES* (handwritten) |

---

DO NOT SIGN THIS BALLOT. Fold and drop in ballot box. If you spoil this ballot
return it to the Board Agent for a new one.
NE SIGNEZ PAS CE BULLETIN DE VOTE. Pliez-le et deposez-la dans l'urne. Si vous
abimez ce bulletin, rendez-le et demandez-en un autre au representant du comite.
NO FIRME ESTA PAPELETA. Dóblela y depósitela en la urna electoral. Si usted daña
esta papeleta devuélvala al Agente de la Junta y pídale una nueva.
XIN ĐỪNG KÝ TÊN TRÊN LÁ PHIẾU. Xin xếp và bỏ lá phiếu vào thùng phiếu. Nếu có làm
hư lá phiếu thì xin đem giao trả lại cho bên bầu cử để được lá phiếu mới.