# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 6, 2008          Decided April 18, 2008

No. 07-1077

ABBOTT AMBULANCE OF ILLINOIS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with
07-1097

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

*D. Michael Linihan* argued the cause for petitioner. With him on the briefs was *Corey Louis Franklin*.

*Fred B. Jacob*, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Stacy Garrick Zimmerman*, Attorney.

Before: GINSBURG and RANDOLPH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: The National Labor Relations Board determined that Abbott Ambulance of Illinois unlawfully refused to bargain with the Professional Emergency Medical Technicians and Paramedics Union. Abbott asserts that it was not obligated to bargain with the union because the Board counted an invalid ballot in the representation election, giving the union an illegitimate one-vote victory. The Board cross-petitions for enforcement of its order.

I.

Abbott maintains its headquarters in St. Louis, Missouri, and operates a satellite facility in Belleville, Illinois. The Belleville facility provides emergency medical treatment and transportation for patients in Madison and St. Clair Counties in southwestern Illinois. Abbott's employees include emergency medical technicians and paramedics. The technicians provide basic life support services, such as stopping bleeding, rescuing accident victims, transporting them to ambulances, and performing cardiopulmonary resuscitation. One of the qualifications for emergency medical technicians is that they must be able to lift and carry an average of 283 pounds up to 25 percent of the time they are lifting and carrying.

Kelly Grant began working as an emergency medical technician in Abbott's Belleville facility in 1999. She injured her left hand and wrist while releasing the catch on a stretcher in October 2001. After her doctor placed her on a 20-pound lifting restriction, she performed light-duty tasks around the office instead of her regular duties. In early February 2002, her doctor removed the lifting restriction and she returned to work

as an emergency medical technician. In May 2002 Grant re-injured her left wrist lifting a patient. A doctor then restricted her to no lifting with her left hand and wrist.

In June 2002, Abbott assigned Grant to light duty in its billings and claims department at the St. Louis office, a non-unit position. Her responsibilities included copying, filing and entering data. In accordance with Abbott's policy, Grant maintained her emergency medical technician wage rate while working on light-duty status. Later in the summer, Abbott offered Grant a full-time position in billings. She declined the position in the hope that she could return to work as an emergency medical technician. In October 2002, an orthopedic surgeon diagnosed Grant with mid-carpal instability of the left wrist and ordered a lifting restriction of 5 pounds. In March 2003, Grant underwent surgery for her wrist. She received physical therapy and her lifting restriction fluctuated between 5 and 10 pounds through August 2003. In October 2003, Abbott informed Grant that light-duty work in billings was no longer available for her. She received her last paycheck for regular hours worked on October 16. Grant then attended a yearly training session in November 2003 and Abbott "town hall meetings" in January, March and April of 2004. Abbott paid her at her technician rate of pay for attending the training session and the March meeting.

On March 1, 2004, the union filed a petition with the Board to represent the Belleville facility's emergency medical technicians and paramedics. The union and Abbott entered into a stipulated election agreement defining the voting unit as "[a]ll full time and regular part-time EMTs, paramedics, customer representatives and couriers employed at [Abbott's] Belleville, Illinois facility," excluding clerical and other types of employees. On April 12, 2004, Grant's doctor discharged her from his care, concluding that she had reached maximum medical improvement and could not lift more than 30 pounds

with her left arm.  Three days later, on April 15, 2004, the Board conducted an election, in which twenty-eight uncontested votes were cast in favor of union certification and twenty-eight uncontested votes were cast against.  At this point, Grant's most recent job had been in billings, where she had not worked for several months.  The Board agent contested three ballots, including Grant's vote, which turned out to be in favor of the union.  Abbott argued that Grant was ineligible to vote because she did not share a community of interest with the voting unit and did not have a reasonable expectation that she would return to work within the voting unit.  The Board's regional director sustained the first two challenges but called for a formal hearing regarding Grant's vote.

After taking evidence, the hearing officer recommended overruling the challenge to Grant's vote.  The hearing officer invoked *Red Arrow Freight Lines, Inc.*, 278 N.L.R.B. 965 (1986), under which an employee who is a member of a unit but is on sick leave, long-term disability, *Atlanta Dairies Coop.*, 283 N.L.R.B. 327 (1987), or workers compensation, *Thorn Ams., Inc.*, 314 N.L.R.B. 943 (1994), "is presumed to continue in such status unless and until the presumption is rebutted by an affirmative showing that the employee has been discharged or has resigned."  The Board adopted the hearing officer's report and recommendations and ordered the regional director to count Grant's ballot and issue the appropriate certification of the union as the bargaining representative of Abbott's emergency medical technicians and paramedic employees. *Abbott Ambulance of Ill. and Prof'l EMTS & Paramedics*, 347 N.L.R.B. No. 82 (2006).

When the union later attempted to bargain collectively with Abbott, the company refused, claiming that the union's certification was invalid because Grant's vote should not have counted.  The Board's General Counsel filed an unfair labor practice charge against Abbott, alleging that the company violated § 8(a)(1) and (5) of the National Labor Relations Act.

29 U.S.C. § 158(a)(1), (5). The Board found that the union's certification was valid and that Abbott's refusal to bargain violated the Act. *Abbott Ambulance of Ill. and Prof'l EMTS & Paramedics*, 349 N.L.R.B. No. 43, at 2 (2007).

## II.

The Board has long held that the "essential element in determining an employee's eligibility to vote" in a representation election is the employee's "status on the eligibility payroll date and on the date of the election. It is without controlling significance that an individual employed on those dates may have intended to quit, or actually did quit, shortly after the election." *Reidbord Bros. Co.*, 99 N.L.R.B. 127, 129 (1952) (citations omitted). This court and others have upheld this hard and fast rule. *See, e.g.*, *Saint-Gobain Indus. Ceramics, Inc. v. NLRB*, 310 F.3d 778, 783 (D.C. Cir. 2002); *NLRB v. Res-Care, Inc.*, 705 F.2d 1461, 1471 (7th Cir. 1983). But what is the status, on election day, of someone who has been laid off or is on sick leave? The Board applies different standards in these two situations. With respect to layoffs, the worker may vote in a representation election if there is a "reasonable expectancy" the company will recall him. *Higgins, Inc.*, 111 N.L.R.B. 797, 799 (1955). On the other hand, if the employee is on sick leave, the Board says it will presume that he may vote "unless and until the presumption is rebutted by an affirmative showing that the employee has been discharged or has resigned." *Red Arrow*, 278 N.L.R.B. at 965. Abbott thinks the Board erred in applying the *Red Arrow* standard to Grant rather than the standard it uses for determining the eligibility of laid off workers. The company has not claimed that it actually laid off Grant. Rather, the company's position is that the *Red Arrow* "test" is irrational as applied to workers on medical leave, such as Grant, who have no reasonable expectation of returning to the unit and who therefore have been "effectively laid off." Pet'r Opening Br. 51. In the alternative, Abbott argues that

Grant's employment status was ambiguous and that the Board should have applied the reasonable expectation standard to determine her eligibility. *See Newly Weds Foods, Inc.*, 758 F.2d 4, 8 (1st Cir. 1985).

Although the Board says its *Red Arrow* standard erects a "rebuttable presumption," that is a misnomer. Individuals who have been fired or quit are obviously not on medical leave. They are no longer employees of the company. *Red Arrow* thus might be seen as stating an unrebuttable proposition: if an "employee" is on medical leave the employee is eligible to vote. The strictness of this standard is somewhat tempered by the Board's position – as Board counsel expressed it at oral argument and in a post-argument submission – that employees on sick leave who accept permanent management positions or positions in another unit before the election are ineligible to vote under *Red Arrow* because they have quit, not the company, but the unit.

We do not think it telling that the Board's *Red Arrow* rule fails to disqualify employees who might not share the interests of others in the unit or who have no intention to remain in the bargaining unit after voting. The same may be said of the Board's eligibility rules followed for more than half a century. In general employees are eligible to vote even if they intend to resign the day after they cast their ballots. *See Edward Waters Coll.*, 307 N.L.R.B. 1321, 1322 (1992); *Dayton Tire & Rubber Co.*, 206 N.L.R.B. 614, 620 (1973). The rule determining eligibility on the basis of the employee's status at the specified times promotes efficiency in administering representation elections. Greater accuracy might be achieved by requiring evidence that each voter will remain in the unit, but the Board could reasonably decide that the gain in accuracy would be outweighed by the delay and uncertainty attending such a system. "There is rapid turnover of workers in many American companies, and if it were a litigable question whether each

worker casting a vote in a union election was likely still to be employed when the union sat down to bargain with the employer the regulation of union campaigns would be greatly complicated." *Res-Care, Inc.*, 705 F.2d at 1471. Much the same can be said of employees on medical leave. To require a determination of their likelihood of returning to the unit would require the Board to evaluate medical evidence, a subject on which the Board has no expertise. These considerations support the *Red Arrow* standard, as the Board has explained: the standard avoids "open[ing] a new avenue of litigation, possibly involving paid expert testimony, which is beyond the traditional expertise of the agency and inimical to the efficient and expeditious resolution of questions concerning representation." *O'Dovero*, 315 N.L.R.B. 1255, 1255 n.3 (1995); *see Home Care Network, Inc.,* 347 N.L.R.B. No. 80, at 1 (2006) (quoting *Vanalco, Inc.*, 315 N.L.R.B. 618, 618 n.4 (1994)).

We therefore join other courts of appeals in upholding the *Red Arrow* standard. *See Cavert Acquisition Co. v. NLRB*, 83 F.3d 598, 606 (3d Cir. 1996); *Newly Weds Foods, Inc.*, 758 F.2d at 7-8.

The Board's application of the standard in this case supported its result. Before the election Abbott did not inform Grant that it had fired her or laid her off, and Grant had not resigned. Abbott's argument that Grant removed herself from the unit – that she was effectively laid off – does not change our analysis. That characterization of her situation did not remove her from the terms of *Red Arrow*, and Abbott's counsel acknowledged as much at oral argument. In any event, Grant's employment status was not ambiguous – she was an employee on medical leave. There is additional evidence supporting the Board's conclusion but it is unnecessary to recount. Abbott also argues about the effect of the *Red Arrow* standard on employers' compliance with state and federal employment discrimination laws. But we see no conflict between the standard and those

laws. An employer who permanently transfers an employee to a non-unit position satisfies an exception to *Red Arrow*. Termination is not necessary to prevent an employee from voting in a unit that he will never rejoin.

Abbott's petition for review is denied and the Board's cross-application for enforcement is granted.

*So ordered.*