**WHITING CORP. v. NATIONAL LABOR RELATIONS BOARD.**

No. 10661.

United States Court of Appeals, Seventh Circuit.

Dec. 2, 1952.

Quentin Ogren and Carl M. Gould, Los Angeles, Cal., Robert N. Denham, Washington, D. C., Hill, Farrer & Burrill, Los Angeles, Cal., for Whiting Corp.

A. Norman Somers, Asst. Gen. Counsel, and Dominick L. Manoli, Atty., National Labor Relations Board, Washington, D. C., George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, and Mark C. Curran, Attys., National Labor Relations Board, Washington, D. C., for respondent.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

Petitioner, Whiting Corporation, who has its main office and plant in the Northern District of Illinois but operates a branch in Norwalk, California, at which some 36 men are employed, seeks a review of an order entered May 14, 1952 by the National Labor Relations Board directing it to bargain with the International Brotherhood of Boilermakers, Iron Shipbuilders and Helpers of America, Local Number 92, A.

F. of L., hereinafter referred to as the union, as the bargaining representative of the production and maintenance employees at the branch. In its order, the Board determined that on February 16, 1951 and all times thereafter the union was the employees' authorized bargaining representative. The propriety of this finding, in turn, depends upon the Board's subordinate finding that the union had been legally selected as the bargaining agent for the employees at an election on October 18, 1950, at which it had been reported that 18 votes had been cast for and 17 against the union.

Petitioner, after the intermediate report in this case, filed a motion to reopen the representation proceedings and to have a further hearing therein for the purpose of determining the eligibility of John Norgard to vote at the election, which petitioner had challenged. This motion having been allowed and the rehearing had, the presiding officer concluded, and the Board in its order of May 14, 1952 agreed, that Norgard was eligible. His vote made the majority. Therefore, the Board found that the union had been properly certified as the representative of the employees for collective bargaining, and, further, that petitioner, having refused to bargain with the union, was guilty of an unfair labor practice. It is this feature of the record with which we are concerned, namely, the question as to whether Norgard was eligible to participate in the election, for, if he was not, the union did not receive a majority, while if he was qualified, the union did prevail. If, upon the scrutiny of the record prescribed by the Act and discussed in N. L. R. B. v. Universal Camera Corp., 340 U.S. 474, 71 S. Ct. 456, 464, 95 L.Ed. 456, we find that the evidence does not adequately support the Board's finding in this respect, then the union was not the employees' representative for collective bargaining and the order declaring petitioner guilty of an unfair labor practice in failing to negotiate with it must fall.

The Supreme Court, in N. L. R. B. v. Universal Camera Corp., supra, has defined the nature of our review under the present law as follows: " * * * Congress has left no room for doubt as to the kind of scrutiny which a court of appeals must give the record before the Board to satisfy itself that the Board's order rests on adequate proof. * * * courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable bounds." Consequently, in resolving this specific question of fact, in order to ascertain whether it "rests on adequate proof", it has been necessary to examine in detail those parts of the record submitted to us by the respective parties, bearing upon the question.

The most telling evidence in this respect came from Norgard's fellow-workmen. This employee worked in a small steel fabricating plant, where his labor was arduous. He was 68 or 69 years old and had developed a severe, long-standing case of arthritis. His doctor had advised him to cease work, and after September 26, 1950, he did no work. In the two weeks immediately preceding that date he talked with various of his fellow employees, who, so far as this record discloses, entertained no other than a friendly attitude toward him. Thus, Fagen testified that, about a week before Norgard left, he told the witness that his wife was coming home from the hospital; that, after he "had thought it all over," he would be "money ahead," if he stayed home; that he could draw social security benefits, and that he did not think that he would ever be back. When Fagen suggested that he could not draw unemployment compensation without a doctor's certificate of disability, Norgard replied that he already had such a certificate. Shaftstall, another coemployee, testified that, early in September, Norgard told him it would be "cheaper" for him, Norgard, to draw his old-age statutory benefits and stay at home; that at the end of each week he would still have a little money left, and that he could do "a lot better" on the benefits. Sandvig, another fellow-workman, testified that Norgard told him a week or so before he left that he felt

that he should retire; that his leg was bothering him, and that he thought he would retire and take care of his wife. Still another fellow-employee, Kirkendall, testified that about a week before Norgard left he told the witness that he did not think he would come back to work.

It is clear from the undisputed testimony of these disinterested fellow-workmen that Norgard had carefully considered his situation and determined that he would quit work, secure unemployment compensation, an old-age pension and social security benefits and live on what he would receive from these sources. Mr. Norgard, himself, apparently an honest and truthful man, said that he remembered little of what he had said to other people but did testify, at a date some two years after the incident had occurred, that he had not quit work on September 26; yet the fact remains that he left at that time and never returned. His job foreman testified that he said he was too old to work and that he would either have to quit or have the company lay him off; that he would prefer that the company "lay him off," so that he could draw unemployment insurance. Norgard said he did not recall this statement, but did not deny making it.

It appears undisputed that petitioner's supervisory employees had a friendly feeling of sympathy and kindness for Norgard and were endeavoring to help him devise a plan whereby he would avoid being discharged or voluntarily quit working, thus jeopardizing some of his statutory allowances. In pursuance of their desire to help him, they noted, as a temporary measure, that he was suspended on account of illness. But a successor in his employment was immediately secured and he never returned or asked for reemployment.

It is clear that Norgard, after consulting his physician, recognized that he was not able to work any longer; that he was convinced that he should not try to do so, and that he would be better off financially and physically if he quit working, took care of his wife at home and drew statutory benefits and assistance than he would if he tried to work. His wavering, uncertain testimony can not outweigh the volume of dis-

interested testimony of other witnesses in this respect. The undisputed testimony that he was recorded as suspended temporarily only because of the intimate relationship between the supervising officers and the employees in this small plant, the obvious desire of those officers to help the old employee bring his labors to an end in a manner which would not prejudice his rights to statutory benefits, in the light of other relevant and undisputed facts, indicate clearly that from and after September 26, 1950 Norgard was no longer an employee of the company, never expected to work again, and was, therefore, disqualified as a participant in the election.

█ The Board's finding that Norgard was still an employee is contrary to all the testimony except that of Norgard, himself. The entirely reasonable testimony, showing clearly the reasons for doing what was done, by other witnesses and all other relevant facts, are convincing. They can not be overcome by the later statement of Norgard that he had asked to be "laid off for a while," which is the only bit of testimony in the record to sustain the finding, and which is inconsistent with voluminous credible evidence to the contrary. We think the conclusion inescapable that the Board failed to give to the evidence that consideration required by N. L. R. B. v. Universal Camera Corp., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456.

█ It seems well established by the Board's own decisions, The Massillon Aluminum Company, 27 N.L.R.B. 165; Western Union Telegraph Company, 32 N. L.R.B. 210 at 215; Van Brunt Mfg. Co., 45 N.L.R.B. 634 at 636; W. D. Byron & Sons of Maryland, Inc., 55 N.L.R.B. 172 at 174, that whether one is an employee is a question to be determined by his reasonable expectation of employment within a reasonable time in the future. We find no escape from the clearly established fact that Norgard had no such expectation.

The union was never legally selected as the bargaining representative of the employees. Upon review of the whole record, we can not satisfy ourselves that the es-

46

sential finding by the Board to the contrary is supported by adequate proof.

In view of our conclusions, we do not reach the procedural questions presented.

The order is set aside.