

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-2-1996

# Cavert Acquisition v. NLRB

Precedential or Non-Precedential:

Docket 95-3231,95-3293

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Cavert Acquisition v. NLRB" (1996). *1996 Decisions.* Paper 168.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/168

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 95-3231


CAVERT ACQUISITION CO.,
d/b/a Cavert Wire Company,

<u>Petitioner</u>

v.

NATIONAL LABOR RELATIONS BOARD,

<u>Respondent</u>


No. 95-3293


NATIONAL LABOR RELATIONS BOARD,

<u>Petitioner</u>

v.

CAVERT ACQUISITION CO.,
d/b/a Cavert Wire Company,

<u>Respondent</u>


On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board
(NLRB Docket No. 6-CA-26733)


Argued December 5, 1995

Before: SLOVITER, <u>Chief Judge</u>,
STAPLETON and SAROKIN, <u>Circuit Judges</u>

(Opinion Filed  May 2, 1996)

Mark S. Shiffman  (Argued)
Jackson, Lewis, Schnitzler & Krupman
Pittsburgh, PA  15222

        (Attorney for Petitioner-Respondent
         Cavert Acquisition Co.)


Aileen A. Armstrong
Linda J. Dreeben
Meredith L. Jason  (Argued)
National Labor Relations Board
Washington, D.C.  20570-0001

        (Attorneys for Respondent-Petitioner NLRB)

OPINION OF THE COURT


SLOVITER, Chief Judge.

Cavert Acquisition Company has petitioned for review of the order of the National Labor Relations Board (Board) compelling it to bargain with the United Mine Workers of America, AFL-CIO (Union); the Union has cross-petitioned for enforcement of the Board's order.  The underlying dispute concerns a union election that was held in 1993 to determine whether certain Cavert employees should be represented by the Union.  Specifically, Cavert challenges the Board's ruling that an employee who had been out of work for five months due to an injury was eligible to vote.  Cavert argues first that the Board applied the wrong standard in reaching the eligibility determination and, alternatively, that the standard was improperly applied in this case.

## FACTS AND PROCEDURAL HISTORY

### A.

### <u>Election and Aftermath</u>

Cavert Acquisition Company[1] is a manufacturer of steel wire. On December 21 and 22, 1993, pursuant to a stipulated election agreement entered into between Cavert and the Union, the Board conducted an election among production and maintenance employees at Cavert's manufacturing plant in North Union Township, Pennsylvania, to determine whether they should be represented by the Union.

During the election the Board agent conducting the election objected to the ballot of Larry Morris because his name did not appear on the eligibility list submitted by Cavert. Morris had been absent from work since a work-related injury five months earlier. The Union challenged the ballots of two employees on the ground that they were supervisors and therefore excluded from the bargaining unit. A tally of the uncontested ballots yielded 16 in favor of the Union and 14 opposed. The three contested ballots were therefore potentially determinative of the election's outcome.

Pursuant to an order of the Acting Regional Director of the Board, a hearing was held before a hearing officer concerning the challenged ballots. The hearing officer's report recommended

---

[1] When this dispute first arose, the name of the employer was Cavert Wire Company. On August 23, 1994, the company was purchased and the business was continued in unchanged form under the name Cavert Acquisition Co., d/b/a Cavert Wire Company.

that all three challenges be overruled and the ballots opened and counted. Cavert and the Union filed exceptions. The Board then issued an order adopting the findings and recommendations of the hearing officer and directing that the disputed ballots be counted. The revised tally was 17 in favor of the Union and 16 opposed. Accordingly, on August 4, 1994 the Board certified the Union as the employees' exclusive collective bargaining representative.

Following certification, Cavert refused to bargain with the Union, claiming that the certification was invalid because of the inclusion of Morris's vote. The Union subsequently filed an unfair labor practice charge with the Board. On motion by the Board's General Counsel, the Board granted summary judgment against Cavert on April 17, 1995, ordering it to bargain with the Union. The challenges as to the supervisors are no longer in dispute, and only Morris's eligibility remains at issue.

**B.**

**Larry Morris**

Morris began working for Cavert in early 1990 and worked steadily, apparently as a cross-trained production worker, until July 21, 1993, when he fell from a ladder sustaining injury to his left leg. Since the accident he has not worked at Cavert or anywhere else. On the day following the injury, Morris was examined by a doctor who gave him a handwritten note stating that he would be "unable to work until further notice." SA. at 6. Morris gave this note to Cavert. Shortly thereafter, Morris

4

filed a workers' compensation claim.  The claim was denied, and he filed a timely appeal.

Cavert sent Morris a letter dated July 30, 1993 informing him that his medical benefits would be terminated as of September 1, 1993 and advising him that under the Consolidated Omnibus Budget Reconciliation Act (COBRA), 29 U.S.C. § 1161-68, he had the right to continue his benefits at his own expense. With the letter, Cavert enclosed a form it had prepared for employees that listed five "qualifying events" that would permit an employee whose group health benefits would end as a result of the event to elect to continue coverage.  The only event arguably applicable to Morris was "[t]ermination of the employee's employment . . . or reduction of hours worked which renders the employee ineligible for coverage."  App. at 135.  Morris did not take any action in response to this letter, and his medical insurance ended on September 1, 1993.

In the weeks following the accident, Morris phoned Cavert a number of times to ask about his workers' compensation claim and to request paperwork relating to his car insurance.  He also visited the plant several times in an effort to obtain the needed paperwork.  After the executive assistant to Aaron Swimmer, Cavert's chief executive officer, told him some time in September 1993 to stop calling or visiting the facility, Morris had no further contact with Cavert other than one visit three months later to retrieve a radio from his locker.

In his testimony before the hearing officer, Swimmer stated that Morris was removed from the payroll after his injury,

5

App. at 82; that removal did not necessarily indicate that he was no longer an employee, since Cavert also removes from the payroll employees who are temporarily absent on sick leave or vacation, App. at 84-85; but that an employee's absence from the payroll in conjunction with a COBRA letter did constitute termination, id.

Swimmer further testified that Morris's position was not filled until 30 to 60 days after his injury; that Swimmer worked with the other employees until then, hoping Morris would return; App. at 69-70, 87; and that although Cavert's personnel handbook states that insurance coverage is not terminated until an employee has been absent from work for three months, Swimmer had the COBRA letter about insurance coverage termination sent to Morris just nine days after his injury because he viewed Morris's workers' compensation claim as "questionable" and was hoping the letter would persuade Morris to drop the claim and come back to work. SA. at 4.

Morris was sent to an independent physician in connection with his workers' compensation claim. That doctor issued a report dated September 2, 1993 releasing Morris for light duty, and the workers' compensation carrier informed Cavert of that report sometime in September 1993. Swimmer testified that if Morris had requested it at that time, he would have given him light duty work, App. at 87-89, but Morris testified that he was never informed that the doctor had released him for light duty, and that none of the other doctors he had seen since the accident had released him to work, either for light or regular duty. App. at 24, 102.

6

Based in part on credibility determinations, the hearing officer rejected the challenge to Morris's ballot. The Board was unanimous in both its opinion adopting the hearing officer's recommendation and its opinion granting summary judgment on the finding that Cavert committed an unfair labor practice. This court has jurisdiction under 29 U.S.C. § 160(e) & (f) over Cavert's petition for review and the Board's cross-application for enforcement.

## II.

## DISCUSSION

### A.

### Board Rule for Eligibility to Vote

As the Supreme Court has made clear in the context of a case considering a challenge to employee ballots cast in a union representation election, it is the Board that has the statutory authority to define bargaining units. See NLRB v. Action Automotive, Inc., 469 U.S. 490, 494 (1985). That authority is explicit in section 9(b) of the National Labor Relations Act. Id. The Board has exercised that authority by focusing on whether the employees permitted to participate in the privileges of a bargaining unit, including voting, share a community of interest. See Action Automotive, 469 U.S. at 494; South Prairie Constr. Co. v. Local 627, Int'l Union of Operating Engineers, 425 U.S. 800, 805 (1976).

In general, an employee who is employed on the last day of the preceding payroll period and on the day of the election is eligible to vote in a certification election. See NLRB v. Newly

7

Weds Foods, Inc., 758 F.2d 4, 7 (1st Cir. 1985); Robert A. Gorman, Basic Text on Labor Law 43 (1976). Because the bookkeeping and payroll practices of employers differ, the Board has developed rules for determining when employees in different circumstances share the community of interest requisite for eligibility to vote in an election.

Central to the issue in this case is the Board's rule that distinguishes between the manner in which voting eligibility is proven for employees who are on layoff at the time of an election and those who are out for medical reasons. It has long been the Board rule that a laid-off employee who, on the day of the election, has a "reasonable expectation" of returning to work is eligible to vote. Higgins, Inc., 111 N.L.R.B. 797, 799 (1955). In contrast, the Board rule is that employees absent from work for medical reasons are presumed to continue in employment status and remain eligible to vote "unless and until the presumption is rebutted by an affirmative showing that the employee has been discharged or has resigned." Red Arrow Freight Lines, Inc., 278 N.L.R.B. 965 (1986). Cavert's principal argument is that the Board's distinction between laid-off employees and those out for medical reasons is unreasonable and "unprincipled," and it argues for application of the "reasonable expectation" rule to Morris.

Apparently because Cavert recognizes that the rule is well within the Board's powers, Cavert fires its principal attack on the application of any deference to the Board's rule. The Board, not surprisingly, argues that we should accord the usual

8

deference both to its formulation of rules and its evaluation of the facts in a particular case.

**B.**

## <u>Deference to be Accorded the Board Rule</u>

In general, unless an issue is governed by an unambiguous statutory provision, courts must defer to an agency's interpretation of a statute it has been entrusted to administer. Thus, the function for the court is not to impose its own interpretation of the statute, but simply to determine whether the agency's interpretation "is based on a permissible construction of the statute." <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 445 n.29 (1987). The agency's interpretation will be "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." <u>Id.</u>

In particular, in considering the validity of standards and rules developed by the Board, courts must accord the Board substantial deference because of its special expertise in "applying the general provisions of the [National Labor Relations] Act to the complexities of industrial life." <u>NLRB v. Erie Resistor Corp</u>., 373 U.S. 221, 236 (1963). This same principle is applied to rules developed by the Board through the adjudicatory process. <u>See</u>, <u>e.g.</u>, <u>NLRB v. J. Weingarten, Inc.</u>, 420 U.S. 251, 266-67 (1975) (rules developed and applied by Board subject to limited judicial review and upheld as long as "permissible" under the statute); <u>see</u> <u>also</u> <u>Jamesway Corp. v. NLRB</u>, 676 F.2d 63, 67 (3d Cir. 1982) (court reviews policies and

procedures established by Board for conduct of elections under abuse of discretion standard).

Cavert argues that our review is plenary, because the standard enunciated in Red Arrow has been inconsistently applied by the Board. It refers us to the Supreme Court's opinion in Cardoza-Fonseca, where the Court, in reviewing the general principles according deference to an agency, stated that where an agency's position "conflicts with [its] earlier interpretation [it] is 'entitled to considerably less deference' than a consistently held agency view." Cardoza-Fonseca, 480 U.S. at 446 n.30 (quoting Watt v. Alaska, 451 U.S. 259, 273 (1981)).

At issue in that case was the standard of proof to be applied to the statutory provision authorizing the Attorney General to grant asylum to an alien. After concluding that the statutory language and history did not support the government's then current interpretation that establishment of "a clear probability of persecution" was the same as showing a "well-founded fear of persecution," the Court noted this was "a pure question of statutory construction for the courts to decide." Id. at 446. It also noted in a footnote that the Bureau of Immigration Appeals had answered the question in at least three different ways, had a "long pattern of erratic treatment of this issue," and "even today does not completely agree, with the INS's litigation position that the two standards are equivalent." Id. at 447 n.30. Because the holding which gave decreased deference to the agency was primarily based on the Court's interpretation of the statutory language and history, the prior inconsistency in

10

the agency's interpretation may have played only a minor role, if any, in the Court's decision.

Moreover, Cardoza-Fonseca was not a labor case, and the Supreme Court has been particularly cautious in the labor field, recognizing that the development of standards by the Board is an "evolutionary process," and that the Board will "modif[y] and reform[] its standards on the basis of accumulating experience" and in light of changing industrial practices. Electrical Workers v. NLRB, 366 U.S. 667, 674 (1961). As the Court recognized in Weingarten, "[t]o hold that the Board's earlier decisions froze the development of this important aspect of the national labor law would misconceive the nature of administrative decisionmaking." 420 U.S. at 265-66. Thus, in Weingarten the Court approved a rule developed by the Board that departed from a number of its prior cases. Accordingly, the mere fact that the Board may have had an inconsistent position in the past does not necessarily signify that it should be accorded no judicial deference.

Cavert relies primarily on some dicta in the majority opinion of this court in NLRB v. Economics Laboratory, Inc., 857 F.2d 931, 935 (3d Cir. 1988). In that case, we reversed the Board's determination that employees who were on long-term disability were still entitled to vote. Although we noted in passing that several of the employer's arguments had "much to commend them," and stated in that context that "[i]t is not clear that the Red Arrow test deserves judicial deference," we immediately thereafter stated that "we need not reach these

11

issues" because the factual issue was dispositive.  Id. at 935. Significantly, therefore, the case was decided using the Red Arrow standard.

Moreover, following our decision in Economics Laboratory, the Supreme Court in NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775 (1990), once again reiterated its position that "we will uphold a Board rule as long as it is rational and consistent with the Act, Fall River [Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 42 (1987)], even if we would have formulated a different rule had we sat on the Board, Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. 404, 413, 418 (1982)."  494 U.S. at 787.  The Court emphasized the policy of deference notwithstanding some prior inconsistency, citing Weingarten for the proposition that "a Board rule is entitled to deference even if it represents a departure from the Board's prior policy."  Id. (emphasis added).

Nor are we convinced that the Board's rule would not be entitled to deference even if there had been some inconsistency or vacillation by the Board in applying the "rebuttable presumption rule" to the eligibility of "sick leave" employees before the Board clearly enunciated its position in its 1986 Red Arrow decision.  In NLRB v. Newly Weds Foods, Inc., 758 F.2d 4 (1st Cir. 1985), then Judge, now Justice, Breyer surveyed the available case law and found that notwithstanding "a surprising lack of uniformity in the relevant materials, with some cases [including court as well as Board] speaking of 'reasonable expectations,' some referring to a 'presumption' of employment in

12

the absence of communicated termination, and some speaking of both, we have found a basic coherence in the Board's approach." Id. at 8 (citations omitted).

Judge Breyer's historical survey led him to note that more than thirty years before, the Board had stated that under its practice, "'an employee on sick leave . . . is eligible to vote in an election.'" 758 F.2d at 8 (quoting Whiting Corporation, 99 N.L.R.B. 117, 123, rev'd, 200 F. 2d 43 (7th Cir. 1952)). This standard is not substantially dissimilar to the one the Board applies today. As Judge Breyer recognized, the Board in Whiting clarified that where it was difficult to ascertain whether an employee has lost or retained status as an employee, it applied the "'reasonable expectation of further employment' standard as an aid in resolving the question." Id. (quoting Whiting, 99 N.L.R.B. at 123) (emphasis in Newly Weds). Based on this clarification, Judge Breyer then noted:

> According to this standard, the Board uses the "reasonable expectations" of 'sick leave' employees only to clarify ambiguities of employment status. The administrative need for such a standard is sufficiently plausible to support the conclusion that this rule lies within the agency's statutory powers.

Id.

When the Seventh Circuit reversed the Board's decision in Whiting on the ground that the Board's factual finding that the employee was eligible to vote was clearly against the weight of the evidence, it commented in a cursory paragraph at the end of the opinion that the reasonable expectation test was "well-

13

established."  200 F.2d at 45.  The court was mistaken because the Board cases to which it cited dealt almost exclusively with layoffs rather than medical leave.  See id. at 45.  As Judge Breyer commented, the court and the Board "passed like ships in the night."  Newly Weds Foods, 758 F.2d at 9.

It was this error that may have led a number of courts to conclude that the reasonable expectation test applies to employees on sick leave.  See NLRB v. New England Lithographic Co., 589 F.2d 29, 32 (1st Cir. 1978); Lake City Foundry Co. v. NLRB, 432 F.2d 1162, 1170 (7th Cir. 1970); NLRB v. Atkinson Dredging Co., 329 F.2d 158, 161, (4th Cir.), cert. denied, 377 U.S. 965 (1964).  We accord these cases little weight, particularly in light of a later Seventh Circuit decision holding that the rebuttable presumption test (which Cavert denominates "unprincipled") is "well-established Board law."  Medline Indus., Inc. v. NLRB, 593 F.2d 788, 791 (7th Cir. 1979).

Notwithstanding the statement in the Seventh Circuit's Whiting decision to the contrary, there is a line of Board cases going back to the 1950's holding that employees on sick leave were eligible to vote unless they had quit or been discharged, see, e.g., Otarion Listener Corp., 124 N.L.R.B. 880, 881 (1959); L. D. McFarland Co., 121 N.L.R.B. 577, 578 (1958); Sylvania Electric Prod., Inc., 119 N.L.R.B. 824, 832 (1957); Foley Mfg. Co., 115 N.L.R.B. 1205, 1206 (1956); Wright Mfg. Co., 106 N.L.R.B. 1234, 1236-37 (1953), albeit one also finds an occasional detour in the Board's use of language, see Sexton Welding Co., 96 N.L.R.B. 454, 456 (1951) (since employer took no

14

steps to discharge sick employee, he had "reasonable expectation" of continued employment). Apparently it was in <u>Miami Rivet Co.</u>, 147 N.L.R.B. 470, 483 (1964), that the Board first characterized its standard of proof for voting in terms of a "presumption," stating that "an employee who is inactive on sick leave is presumed to continue in that status until recovery and . . . the party seeking to overcome that presumption must make an affirmative showing that the employee has resigned or that the employer has earlier discharged him." <u>Id</u>. at 483. In the 1970's the Board's own internal guidelines also clearly endorsed the rebuttable presumption test. <u>See</u> Office of General Counsel, <u>Outline of Law and Procedure in Representation Cases</u> 284 (1974) (cited in <u>Newly Weds Foods</u>, 758 F.2d at 7).

Admittedly, despite this seemingly clear formulation of the rule, some subsequent Board decisions made reference to reasonable expectations in evaluating the voting eligibility of employees absent due to illness. <u>See</u> <u>Price's Pic-Pac Supermarkets, Inc.</u>, 256 N.L.R.B. 742, 743 (1981), <u>enf'd</u> 707 F.2d 236 (6th Cir. 1983); <u>Cato Show Printing Co.</u>, 219 N.L.R.B. 739, 754 (1975). Thus, when the Board made another attempt in <u>Red Arrow</u> to clarify the rule, by stating that the rebuttable presumption standard is "[t]he fundamental rule governing the eligibility of an employee on sick or maternity leave," 278 N.L.R.B. at 965, it explained that the use of the phrase "reasonable expectation of employment" in some prior sick leave cases had been simply an "inadvertent" use of language in "isolated" cases. <u>Id.</u> at 965 n.5.

15

We have no reason not to accept that explanation, given the number of such election issues that have been raised over the years, and the changes in Board personnel.  Indeed, we can think of few appellate courts that have spoken on any issue over the years with precise consistency of language.  We find most significant that in the nine years since the Red Arrow decision there has been virtual consistency in application of the rebuttable presumption rule--now denominated as the "Red Arrow test."  See Mediplex of Connecticut, Inc., 319 NLRB, No. 39, slip op. at 19 (1995); Monfort, Inc., 318 NLRB, No. 19, slip op. at 1, n. 5 (1995); Appalachian Machine and Rebuild Co., 317 NLRB 1343, 1351 (1995); Virginia Concrete Co., 316 NLRB 261, 267 (1995); Pepsi-Cola Co., 315 N.L.R.B. 1322, 1324 (1995); O'Dovero, 315 N.L.R.B. 1255 (1995); Vanalco, Inc., 315 N.L.R.B. 618 (1994); Thorn Americas, Inc., 314 N.L.R.B. 943 (1994); Edward Waters College, 307 N.L.R.B. 1321, 1322 (1992); Custom Bent Glass Co., 304 N.L.R.B. 373, 374 (1991); K. Van Bourgondien & Sons, Inc., 294 N.L.R.B. 268, 274-75 (1989); Jennings & Web, Inc., 288 N.L.R.B. 682, 696-97 (1988), enf'd 875 F.2d 315 (4th Cir. 1989); Atlanta Dairies Coop., 283 N.L.R.B. 327 (1987).

In light of this pattern of rulings, we believe it is of little value to engage in the minutiae of a case-by-case analysis of each post-Red Arrow case to which Cavert points.  It is unclear, for example, whether Advance Waste Systems, Inc., 306 N.L.R.B. 1020 (1992), Cavert's principal example, was a sick leave case or a layoff case, as the Board has denominated it. The Board has explicitly "disavow[ed] any construction of Advance

16

<u>Waste Systems</u> as appropriately applying a 'reasonable expectation of employment' test to sick leave cases, and we continue to adhere to the <u>Red Arrow</u> test." <u>Pepsi-Cola Co.</u>, 315 N.L.R.B. 1322, 1324 (1995); <u>accord</u> <u>Thorn Americas, Inc.</u>, 314 N.L.R.B. 943 (1994).

In the other two post-<u>Red Arrow</u> cases Cavert cites, <u>Keeler Brass Automotive Group</u>, 301 N.L.R.B. 769 (1991), and <u>Liston Aluminum</u>, 296 N.L.R.B. 1181, 1203 (1989), <u>enf'd</u> 936 F.2d 578 (9th Cir. 1991), the Board used reasonable expectation language but based its determination solely on the fact that there had been no affirmative termination of employment. At most, these cases cited by Cavert present minor inconsistencies in the Board's otherwise uniform adherence to the rebuttable presumption test since its definitive pronouncement in <u>Red Arrow</u>.

Cavert makes an additional argument based on the fact that certain members of the Board have dissented from application of the <u>Red Arrow</u> rule. We fail to see its relevance, particularly in light of the fact that the Board member on whose dissents it relies, Member Cohen, was on the Board panels that ruled in this case. Member Cohen joined both the Board's unanimous rulings granting summary judgment and adopting the recommendation of the hearing officer directing that Morris's ballot be counted. A footnote to that latter Decision and Direction states that:

> In agreeing that Larry Morris is an eligible voter, Member Cohen finds that, under either of the views expressed in <u>Red Arrow Freight Lines</u>, 278 NLRB 965 (1986), Morris retained his employee status as of the determinative date.

17

App. at 110.

Giving the Board rule the appropriate deference, we turn therefore to consider whether the Board's Red Arrow test is "arbitrary" or "capricious." INS v. Cardoza-Fonseca, 480 U.S. at 445 n.29. Clearly it is not. The Board explains that it favors an objective test that is simple, predictable and easily administered. It prefers a "bright-line" rule that avoids inquiry into the intentions of the parties or the employee's medical prognosis. The Board is particularly concerned that applying the reasonable expectations test to medical leave situations would require it to evaluate medical evidence and would thereby "open a new avenue of litigation, possibly involving paid expert testimony, which is beyond the traditional expertise of the agency and inimical to the efficient and expeditious resolution of questions concerning representation." O'Dovero, 315 N.L.R.B. 1255 n.3 (1995); see also Vanalco, Inc., 315 N.L.R.B. 618 n.4 (1994) (Red Arrow test avoids "endless investigation into states of mind or future prospects" (quoting Whiting Corp., 99 N.L.R.B. 117, rev'd 200 F.2d 43 (7th Cir. 1952))); NLRB v. Staiman Bros., 466 F.2d 564, 566 n.2 (3d Cir. 1972)(same).

The rebuttable presumption test represents a rational attempt by the Board to balance the need to make accurate determinations as to whether employees share a "community of interest" against the necessity to make such determinations quickly and definitively so that lengthy disputes regarding union

18

elections can be avoided and employment relations can proceed normally, whether through collective bargaining or otherwise. We are not in a position to hold that it was unreasonable for the Board to have determined that engaging in fact-finding regarding the medical prognosis of employees would be too time-consuming.

Cavert's contention that the Board's concerns regarding the difficulty of evaluating medical evidence under the reasonable expectations test have been largely ameliorated by passage of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq., is unconvincing. The Act requires an employee taking a leave of absence for medical reasons to submit medical documentation regarding the reason for the leave and the prognosis for return. Id. § 2613. We are unpersuaded that the requirement that medical documentation be submitted to employers will suddenly make such documentation easier for the Board to interpret or will preclude the possibility that medical opinions concerning an employee's condition or prognosis will conflict. Moreover, it is for the Board, not this court, to determine whether recent developments in the law warrant a change in its standard.

We recognize that there may be instances in which it may be clear from objective factors that an employee who has been out for medical reasons no longer retains the requisite community of interest, notwithstanding the failure of either party to communicate that termination of employment. As the Board's counsel stated at oral argument, the employer concerned about that issue could frame a personnel rule that employees out for

19

medical reasons for a specified period will be considered to have been terminated. In any event, the difficulty that may be presented in occasional cases would not justify us in disturbing the Board's Red Arrow standard using a rebuttable presumption which it, in its expertise, has decided for rational reasons is the best approach to determining which employees are eligible to vote.

Accordingly, we turn to consider whether Cavert has presented any reason to disturb the Board's findings in this particular case.

### C.

### **Substantiality of Evidence to Support the Findings**

When reviewing the Board's findings of fact or application of a valid rule to the facts, we will uphold the Board's decision as long as it is supported by substantial evidence on the record. NLRB v. Asbury Graphite Mills, Inc., 832 F.2d 40, 43 (3d Cir. 1987); NLRB v. Certified Testing Labs., Inc., 387 F.2d 275, 277 (3d Cir. 1967). We consider therefore whether there is substantial evidence to support the finding made by the hearing officer, and adopted by the Board, App. at 119, that "there is no evidence to support the conclusion that [at the time of the election] Morris' employment [had] affirmatively been terminated." App. at 103. Cavert, as the party seeking to preclude Morris's vote, bears the burden of proof. Economics Laboratory, 857 F.2d at 936.

In general, an affirmative termination of employment in this context requires "a manifestation of the intent to terminate

20

which is clearly communicated to the other party." NLRB v. Staiman Bros., 466 F.2d 564, 566 (3d Cir. 1972). For example, in Miami Rivet Co., 147 N.L.R.B. 470, 483 (1964), the Board held that an employee out of work due to a heart attack was eligible to vote, even though the employer had decided to discharge him, because the employer had never communicated that intention to the employee prior to the election. See also Otarion Listener Corp., 124 N.L.R.B. 880, 881 (1959); Wright Mfg. Co., 106 N.L.R.B. 1234, 1236–37 (1953). Thus, Cavert cannot merely point to its own subjective intention or understanding that the employment relationship had been terminated to establish an affirmative termination.

However, it is not necessary that the communication that effects the termination be a formal termination letter, although that facilitates proof. In instances where the surrounding circumstances make clear that the employment relationship has ended, an affirmative termination has been found even in the absence of any communication, whether formal or informal. See Economics Laboratory, 857 F.2d at 937–38; Harry Lunstead Designs, Inc., 270 N.L.R.B. 1163, 1164 (1984); Hercules, Inc., 225 N.L.R.B. 241, 242 (1976).

Cavert produced no evidence of any specific communication with Morris regarding his termination. Cavert points to the facts, which the Board does not dispute, that Morris never contacted Cavert to express a desire or ability to return to work during the five months between his injury and the election; was instructed by Cavert to stop contacting the

21

company; was sent the July 30, 1993 letter terminating his health insurance and failed to respond to it; and that Morris's name was removed from the payroll. The hearing officer found these facts did not show affirmative termination.

We consider them seriatim in light of the relevant evidence. Clearly, Cavert cannot establish an affirmative termination simply by showing a lack of communication between the parties. Under the circumstances of this case, the mere fact that Morris did not contact the company to discuss his desire or ability to return to work is not probative of his termination of employment, voluntary or not. The hearing officer found that Morris was never told by a doctor that he could return to work, a finding supported by substantial evidence. The doctor who saw Morris the day after the injury had written a note that Morris was "unable to work until further notice." SA. at 6. Although the independent physician who examined Morris in September advised the company he was released for light duty, the hearing officer found credible Morris's testimony that he never knew of that recommendation until he reviewed the doctor's report in preparation for the hearing. There is no evidence to the contrary, and we have no reason to disturb this credibility determination.

The hearing officer also found that although "Morris has not contacted the Employer to update the Employer on his condition, or to inform the Employer when he will be able to return to work," it was uncontroverted "that Morris was told some time in September by an executive assistant to stop contacting

22

the Employer." App. at 102. Furthermore, the communication that did occur between the parties did not manifest an intent to terminate the employment. There is no evidence that at the time that Morris was directed not to contact the company, any of the representatives of the company made any statement to Morris about the status of his job.

Cavert would have us draw the inference from the COBRA letter, read in conjunction with the notice that accompanied it, that Morris's employment had been terminated. However, the letter contained no direct statement to that effect. Moreover, Swimmer himself testified that at the time he sent the COBRA letter his purpose in sending the letter was to persuade Morris to come back to work, not to terminate his employment, and that he did not then view Morris's employment as terminated.

Having no basis in the record to find that there was any direct communication of a termination of Morris's employment relationship, we consider whether the totality of the circumstances made clear that there had been a termination of the employment relationship--what this court previously referred to as a "constructive termination." See Economics Laboratory, 857 F.2d at 937.

Cavert argues that termination is shown by the facts that Morris cleaned out his locker a week after his injury and that his position was filled. The evidence as to whether Morris cleaned out his locker is inconclusive, however, and the hearing officer made no relevant finding. Although Morris, in listing all of his contact with the company following his injury,

23

testified that he visited the plant several times in the weeks following his injury, he did not state he cleaned out or even retrieved items from his locker during those visits. In fact, Morris's only reference to visiting his locker was that he went to the plant to retrieve his radio from his locker in December 1993, some five months after the injury. Swimmer's testimony that when he saw Morris at the plant one week after the accident Morris told him "he was cleaning out his locker -- he came to get some things from his locker," App. at 64, was uncorroborated. Since the hearing officer found some of Swimmer's testimony equivocal, we are not inclined to overturn her affirmative finding of no communication of termination on this inconclusive and contradicted evidence.

Finally, Cavert would have us find constructive termination based on Swimmer's testimony that Morris had been replaced 30 to 60 days after his injury. However, the hearing officer gave little weight to the replacement noting Swimmer's testimony that most of Cavert's employees are cross-trained and perform interchangeable jobs. It is not clear whether Cavert replaced Morris's particular position or simply hired an additional worker. Indeed, the hearing officer considered Swimmer's testimony that Morris was replaced, that until then he had hoped Morris would return, that he sent the COBRA letter on July 30, 1993, nine days after Morris's injury, but that he considered Morris's employment terminated on September 1, 1993 when his health insurance benefits ended, and that Morris could have returned for light duty work had he requested it sometime in

24

September. The hearing officer then found all of the above testimony to be "very contradictory" and thus accorded it little, if any, weight. App. at 104. Cavert has offered no reason for us to disturb this credibility determination.

There are significant distinctions between the facts on this record and those before the Board and court in the constructive termination cases cited by Cavert. In Hercules, Inc., 225 N.L.R.B. 241 (1976), the terms of an indefinite "leave of absence" granted an ill employee by the employer, as communicated to the employee, made it clear that in fact she had been terminated and invited to reapply when she recovered from her illness. She was "expressly" told that when she recovered she would not get her job back immediately but would have to wait for an opening, and that on return she would have no more seniority rights than a new hire. 225 N.L.R.B. at 241-42. Shortly after the employee left, the employer notified its own headquarters that she had been terminated. Under the clear terms of the personnel manual, she had by her absence lost her seniority and recall rights months before the election. In light of all these circumstances, the Board found an affirmative termination despite the employer's failure to provide formal notification to the employee.

In Harry Lunstead Designs, Inc., 270 N.L.R.B. 1163 (1984), after an employee had been out of work for three months due to an injury and the employer had determined that there was little chance she would return, the employer changed its payroll records and personnel files to indicate that she had been

25

terminated due to extended absence. Under these circumstances, the Board found an affirmative termination despite the lack of evidence of formal notification of the employee. 270 N.L.R.B. at 1164. No comparable evidence is in this record, where the employer conceded that a change in payroll records does not necessarily signify termination.

In Economics Laboratory, where we held that employees in the employer's Long Term Disability (LTD) program had been constructively terminated and were therefore ineligible to vote under the Red Arrow standard despite the absence of any formal termination letter, there was other evidence to show termination. In order to participate in the LTD program employees had to be totally disabled such that they were unable to work for pay and absent from work due to disability for at least six months. 857 F.2d at 933. The company's written description of the LTD Program "suggest[ed] that the participants [were] no longer employees," inasmuch as it stated that "returning you to work with the company will depend on your successful rehabilitation and the availability of a job." Id. The positions of LTD participants were filled with permanent replacements, and, although they retained seniority rights for three years, seniority was not a factor in rehiring. Thus, a returning LTD participant was treated as a new applicant. Additionally, LTD participants were removed from the payroll and the "Employee Status Report," the document issued by the company for all personnel decisions, and a person whose name did not appear on the Employee Status Report was not deemed an employee by the

26

company.  Id. at 937 n.11.  Finally, two of the LTD participants at issue in Economics Laboratory received social security disability benefits which required them to prove an inability to engage in any substantial gainful activity for at least twelve months.  Id. at 938.  Notwithstanding some parallels to the case before us, these critical differences convince us that Economics Laboratory does not control.

Cavert asks us to take judicial notice of the decision issued February 24, 1995 in Morris's workers' compensation case, ruling that he was "totally disabled from his pre-injury job as of July 22, 1993, to the present" and therefore eligible for benefits.  App. at 152.  This was issued a year and two months after the election and seven months after the Board ordered that Larry Morris's ballot be counted, and thus was not part of the record before the Board.  In reviewing the Board's voting eligibility determination, we must limit our consideration to the evidence available at the time of the election, see NLRB v. Jesse Jones Sausage Co., 309 F.2d 664, 666 (4th Cir. 1962), because that is the only evidence relevant in considering whether its findings are supported by the record.  Accordingly, the 1995 workers' compensation decision is irrelevant.

Although we acknowledge that a different decision-maker could have decided on these facts that a constructive termination had occurred, it is not our role to substitute our judgment for that of the Board.  See NLRB v. L & J Equipment Co., 745 F.2d 224, 230 (3d Cir. 1984).  There is substantial evidence in the record to support the hearing officer's determination that there

27

was no constructive termination of Morris's employment prior to the election, and therefore we will uphold the Board's decision.

### III.

### CONCLUSION

For the reasons set forth above, Cavert's petition for review will be denied and the Board's cross-petition for enforcement of its order will be granted.