NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-4569, 10-4683, 11-1564 & 11-1742
_____

NATIONAL LABOR RELATIONS BOARD,
                            *Petitioner/Cross-Respondent*

v.

GRAPETREE SHORES, INC. d/b/a DIVI CARINA BAY RESORT
                            *Respondent/Cross-Petitioner*
_____

On Petition for Review and Application for Enforcement
of Orders of the National Labor Relations Board
(NLRB Nos. 24-CA-11101, 24-CA-10700)
_____

Submitted Under Third Circuit LAR 34.1(a)
October 26, 2011
_____

Before: SLOVITER, GREENAWAY, JR., *Circuit Judges*,
and POLLAK, *District Judge**

(Opinion filed: November 16, 2011)
_____

OPINION
_____

---

* Honorable Louis H. Pollak, Senior Judge of the United States District Court for the
Eastern District of Pennsylvania, sitting by designation.

POLLAK, *District Judge*.

The National Labor Relations Board ("the Board") petitions for enforcement of two of its orders stemming from a representation election for employees of Grapetree Shores, Inc., d/b/a Divi Carina Bay Resort ("the Company"), held at the behest of the Virgin Islands Workers Union ("the Union"). The Company cross-petitions for review of both orders. For the reasons that follow, we will grant the Board's petitions for enforcement of both of its orders and will deny the Company's petitions for review.

**I.**

The representation election was held on July 13, 2007, pursuant to a stipulated election agreement between the Union and the Company. The initial tally of ballots favored the Union, 45 votes to 42 votes, but the outcome was contingent on the resolution of several ballot challenges—including a challenge to the ballot cast by Felicia Dixon. The Company's position was and is that Dixon was ineligible to vote because she had been terminated pursuant to Company policy after being on sick or disability leave for more than six months prior to the election.

In addition to the ballot challenges, the Union and the Company each filed objections to the election conditions. We limit our discussion to those challenges that remain relevant to the current petitions. The Company claimed that Union supporter Lucy Edward made public threats against opponents of the Union and that the Union's designation of Edward as an observer of the election intimidated those voters who had heard the threats or heard about them. The Union claimed that the Company had interfered with the election conditions by announcing new retirement benefits two days

2

before the election; the Union also filed a charge of unfair labor practice based on the same announcement. The Union's charge, the Dixon ballot challenge, and the Company's objection to Edward's conduct were all the subject of a November 6, 2007, hearing before an administrative law judge of the Board.

The ALJ issued a recommended decision and order on February 8, 2008, in which he found that: (i) Dixon was eligible to vote because she was on leave and had not been terminated; (ii) Edward did not make the alleged public threats and thus did nothing to warrant overturning the election results; and (iii) the Company's announcement of new retirement benefits was an unfair labor practice because the timing of the announcement in the critical period before the election was coercive.

Two sitting members of the Board severed the representation proceeding from the unfair labor practice charge in an unpublished order dated July 30, 2008. As to the former, the two members adopted the ALJ's recommendation to overrule the Company's objections and to count Felicia Dixon's ballot. Dixon's ballot—together with three others which had been withheld from the initial tally pending challenges—was subsequently opened and mixed in with the other votes. A revised tally showed the Union prevailing by a vote of 46 to 45 (rather than the initial margin of 45 to 42). So the balance of the election may well have hung on Dixon's vote.

The Union was certified as the exclusive collective-bargaining unit for covered employees on August 18, 2008. In January 2009, the General Counsel of the Board filed an unfair labor practice charge and complaint against the Company for refusing to bargain with the certified Union. The Company admitted its refusal but continued to

3

challenge the validity of the certification. Two sitting members of the Board determined that the Company's refusal to bargain with the Union violated sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (5). *Grapetree Shores, Inc.*, 353 N.L.R.B. No. 131 (Apr. 10, 2009).

The order of April 10, 2009, was the subject of a petition for enforcement and a cross-petition for review in this court. While those petitions were pending, the Supreme Court held in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), that the NLRA did not permit two members of the Board to function as a quorum of a three-member group upon the expiration of the terms of the other Board members—as two members had purported to do in this and many other cases. We remanded the pending petitions to the Board (now with more than two members), which afforded the Company a second opportunity to justify its refusal to bargain. *Grapetree Shores, Inc.*, 355 N.L.R.B. No. 194 (Sept. 28, 2010). Ultimately, on December 7, 2010, a proper quorum of the Board held that the Company's refusal to bargain violated sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. § 158(a)(1), (5). *Grapetree Shores, Inc.*, 356 N.L.R.B. No. 47 (Dec. 7, 2010).

By separate order, the Board on December 29, 2010, also adopted the ALJ's recommended finding that the Company's announcement of new retirement benefits prior to the election had violated section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1). *Grapetree Shores, Inc.*, 356 N.L.R.B. No. 60 (Dec. 29, 2010).

The Board subsequently petitioned this court for enforcement of both of its December 2010 orders, and the Company cross-petitioned for review of each order. All four matters were consolidated for our disposition.

4

Because the conduct at issue occurred in the U.S. Virgin Islands, jurisdiction is proper in this court as to both the petitions and cross-petitions. NLRA § 10(e)-(f), 29 U.S.C. § 160(e)-(f). To the extent that the Board's decisions and orders are based on findings of fact made in the underlying representation proceeding, the record of that proceeding is also before the court. NLRA § 9(d), 29 U.S.C. § 159(d).

## II.

All of the Company's challenges to the Board's orders sound in factual disputes, for which our review is circumscribed. "[W]e must . . . accept the Board's factual determinations and reasonable inferences derived from factual determinations if they are supported by substantial evidence." *Stardyne, Inc. v. NLRB*, 41 F.3d 141, 151 (3d Cir. 1994) (citing, *inter alia*, 29 U.S.C. § 160(e)). A decision of the Board rests on substantial evidence if a reasonable jury could have come to the same conclusion. *Citizens Pub'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001).

## III.

Having examined the record and the parties' submissions, we are persuaded that both of the Board's orders rest on substantial evidence. We consider the three disputed issues in turn. Because we write primarily for the parties, our discussion is brief.

### A. Dixon's Eligibility to Vote

Felicia Dixon was a housekeeping employee who suffered a work-related injury that required her to avoid certain physical exertions. In January 2007, the Company placed Dixon on a leave of absence because it did not have any medically appropriate "light duty" work for a person of Dixon's qualifications. Dixon performed no work for

5

the Company between January 2007 and the July 2007 election. The Board nevertheless concluded that Dixon was eligible to vote in the election, because an employee on sick or disability leave "is presumed to continue in such [employment] status unless and until the presumption is rebutted by an affirmative showing that the employee has been discharged or has resigned." *Red Arrow Freight Lines, Inc.*, 278 N.L.R.B. 965, 965 (1986).

The Company's objections are twofold. First, the Company argues the Board should have applied not the presumption of *Red Arrow* but rather an alternate approach—one which looks to an employee's reasonable expectation of being recalled to the job, as advocated by a dissenting member of the Board in *Home Care Networks, Inc.*, 347 N.L.R.B. 859, 860 (2006). Second, the Company claims that the Board's conclusion that Dixon remained an employee was not supported by substantial evidence.

The first argument is, in this court, foreclosed by our own precedent. We have already decided that the Board's *Red Arrow* presumption is a reasonable, bright-line rule. *See Cavert Acquisition Co. v. NLRB*, 83 F.3d 598, 603-07 (3d Cir. 1996). The Company does not point to any intervening development that would permit us to revisit this holding, let alone any reason to do so.

The second argument also fails. There was substantial evidence to support the Board's conclusion that Dixon had not been terminated because, among other things, the Company never gave her any indication to the contrary and the Company continued to list her name on weekly work schedules (which marked her as "OUT"), including the schedule for the week of the election. The Board was not required to credit the testimony of the Company's representative concerning a putative policy of automatically

6

terminating employees who are on sick or disability leave for more than six months—particularly in the absence of any credible documentation of such a policy.

**B.      Edward's Pre-Election Conduct**

The Company also claims that the Board erred in certifying the Union because the election was tainted by threats against Union opponents allegedly made by Lucy Edward, an employee of the Company who served as an observer for the Union at the representation election.  Two other employees of the Company submitted sworn affidavits to the ALJ in which they alleged that Edward had entered an employee dining room the day before the election and had threatened anti-Union employees by announcing: "I does thank God I don't come to work with a gun because I will kill a lot of people and they will be sorry."  Edward flatly denied making any such statement.

The Company relied on the testimony of employee Phyllis Blackman (not one of the two affiants) to corroborate its claim that Edward threatened Union opponents.  In testimony before the ALJ, Blackman claimed that she and other employees in her department were threatened by Union supporters.  But while Blackman implied that Edward was among the group of employees making threats and that Edward's later presence at the election was threatening, she also denied having had any conversations about the Union with Edward and denied even knowing prior to the election that Edward was affiliated with the Union.

It is a labor law axiom that "[a] representation election should be 'a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees.'"  *Zeiglers Refuse Collectors, Inc. v.*

7

*NLRB*, 639 F.2d 1000, 1004 (3d Cir. 1981) (quoting *Gen. Shoe Corp.*, 77 N.L.R.B. 124, 127 (1948)). But we are persuaded in this instance that there was substantial evidence in the record to support the Board's conclusion that Edward did not make the alleged threats and thus did nothing to imperil the conditions of the election. The ALJ accurately described key portions of Blackman's testimony as "a bit of a muddle," and the choice to credit Edward over both Blackman and the two affiants was a reasonable one. The affiants did not take any steps consistent with their claim that Edward had threatened violence; Blackman denied any specific conversations with Edward and attributed the alleged threats to a group of unnamed employees.

The Company further argues that the ALJ erred in treating Edward as a Union supporter rather than a Union agent, but that distinction matters only if Edward in fact made the objectionable statements. The ALJ considered the question as an alternative holding, the Board declined to adopt that portion of his recommended decision, and we decline to discuss the matter superfluously.

### C.     The Retirement Benefits Announcement

Finally, the Company contends that there was not substantial evidence to support the Board's finding that the Company violated section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), by announcing new retirement benefits two days before the election.

The Company had been party to an economic development agreement with the U.S. Virgin Islands government that was set to expire in 2006. The prior agreement required the Company to provide its employees with the opportunity to invest in 401(k) retirement accounts, though the Company was not itself obligated to contribute anything

8

to the plans.  After public hearings on the Company's effort to renew the expiring development agreement, the U.S. Virgin Islands government sought to require the Company to match some portion of its employees' contributions to the plans.

On July 10, 2007, the new economic development agreement—including a provision requiring the Company to contribute to its employees' 401(k) plans—was finally approved by the governor.  The following day, July 11, the Company's general manager announced the 401(k) changes to employees.  The announcement was made in two meetings convened specifically about the election.  The election was held two days later, on July 13.

In its December 29, 2010 order, the Board adopted the ALJ's conclusion that the timing of the announcement gave rise to a presumptive inference that the Company was attempting to coerce employees—an inference which the Company failed to rebut.  *See Mercy Hosp. Mercy Sw. Hosp.*, 338 N.L.R.B. 545, 545 (2002) (describing presumption); *see also NLRB v. Exch. Parts Co.*, 375 U.S. 405, 409 (1964) ("The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.").  The Board has been particularly skeptical of such announcements when it is clear that the timing of the news lies within the employer's discretion, as appears to have been the case here.  *See, e.g.*, *Brown City Casting Co.*, 324 N.L.R.B. 848, 849 (1997); *Am. Red Cross*, 324 N.L.R.B. 166, 171 (1997); *Speco Corp.*, 298 N.L.R.B. 439, 443 (1990).

The Company argues that the governor's July 10, 2007, approval of the economic development agreement—and not an intent to influence the election—was the reason the Company announced the 401(k) benefits on July 11. It is true that the Board's precedents permit an employer to announce new benefits in the critical period prior to an election when the employer can establish some legitimate business reason for the timing of the announcement. *See Mercy Hosp. Mercy Sw. Hosp.*, 338 N.L.R.B. at 545 (citing *STAR, Inc.*, 337 N.L.R.B. 962, 962 (2002)). But the Board concluded here that the Company had no legitimate business reason to announce the 401(k) changes on July 11 and not some later date, and that conclusion was supported by substantial evidence. As the ALJ noted, the record demonstrated that the governor's signature was but one of several important steps on the route to the ratification and implementation of the development agreement.

Nor are we persuaded that a contrary outcome is required by *Weather Shield of Connecticut,* 300 N.L.R.B. 93 (1990), the principal case on which the Company relies. In *Weather Shield*, the Board reversed an ALJ's conclusion that the employer's election-eve announcement of pension benefits was unlawful. *Id.* at 96. The employees were due to receive the pension benefits as the result of an earlier merger, and the Board reasoned that announcing future pension benefits to which the employees were already automatically entitled was no different than publicizing current benefits. *Id.* at 96-97. The case at bar is assuredly quite different: the details of the 401(k) benefits remained to be worked out and its future implementation remained uncertain. It was thus reasonable for the Board to

10

conclude that the 401(k) benefits announced on July 11 were not so firmly established as to be treated as existing benefits.

## IV.

For the preceding reasons, we grant the Board's petitions to enforce the Board's orders of December 7, 2010, and December 29, 2010, and we deny the Company's cross-petitions for review.