**PENNSYLVANIA FOOD MERCHANTS ASSOCIATION; Aldi, Inc. (Pennsylvania); Save–A–Lot; Greenwich Market, and Redner's Markets, Inc., Plaintiffs,**

v.

**Feather O. HOUSTOUN, Secretary of Public Welfare, and Citicorp Services, Inc., Defendants.**

No. Civ.A. 1:CV–97–1276.

United States District Court, M.D. Pennsylvania.

Jan. 21, 1998.

Lewis S. Kunkel, Jr., Pepper, Hamilton & Scheetz, Harrisburg, PA, Thomas B. Schmidt, III, Pepper, Hamilton & Scheetz, Harrisburg, PA, Timothy B. Anderson, Pepper, Hamilton & Scheetz, Harrisburg, PA, for Pennsylvania Food Merchants association, plaintiff.

Lewis S. Kunkel, Jr., Thomas B. Schmidt, III, Timothy B. Anderson, (See above), for Aldi, Inc. (Pennsylvania), plaintiff.

Lewis S. Kunkel, Jr., Thomas B. Schmidt, III, Timothy B. Anderson, (See above), for Sav–A–Lot, plaintiff.

Lewis S. Kunkel, Jr., Thomas B. Schmidt, III, Timothy B. Anderson, (See above), for Greenwich Market, plaintiff.

Lewis S. Kunkel, Jr., Thomas B. Schmidt, III, Timothy B. Anderson, (See above), for Redner's Markets, Inc., plaintiff.

James J. Kutz, Eckert, Seamans, Cherin & Mellott, Harrisburg, PA, Bridget E. Montgomery, Eckert Seamans Cherin & Mellott, Harrisburg, PA, LeRoy S. Zimmerman, Ec-

kert Seamans Cherin & Mellott, Harrisburg, PA, for Feather O. Houstoun, Secretary of Public Welfare, defendant.

Fred T. Magaziner, Dechert, Price & Rhoads, Philadelphia, Pa, Hope M. Freiwald, Dechert, Price & Rhoads, Philadelphia, PA, David R. Kraus, Dechert Price & Rhoads, Harrisburg, PA, for Citicorp Services, Inc., defendant.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

The plaintiffs are the Pennsylvania Food Merchants Association, a trade association of retail food merchants, and four of its members, Aldi, Inc. (Pennsylvania), Save–A–Lot, Greenwich Market and Redner's Markets, Inc.[1] They allege that Pennsylvania's plan for implementing computerized transfers of food stamp benefits violates the Food Stamp Act. *See* 7 U.S.C. §§ 2011–2030. The defendants are Feather O. Houstoun, Pennsylvania's Secretary of Public Welfare, and Citicorp Services, Inc., the third party administrator of the plan.

Briefly, Pennsylvania's plan is to provide food retailers with free computer terminals so that they can have free processing of food-stamp point-of-sale transactions. The retailers need not accept the terminals, but if they do so, they must forego processing cash-assistance point-of-sale transactions.

The plaintiffs contend that this plan violates the Food Stamp Act in two ways. First, it improperly imposes certain costs of the food stamp program on retailers. Second, it illegally ties free food stamp terminals to not accepting point-of-sale service from Citicorp's competitors. Invoking 42 U.S.C. § 1983, the plaintiffs sought declaratory relief along with preliminary and permanent injunctive relief.

The parties agreed that, before the court would consider granting equitable relief, the plaintiffs would file a motion for summary judgment to test the merits of their cause of action. The plaintiffs complied and we are considering that motion. We are also consid-

ering whether the case is moot, based, as the plaintiffs urge in their reply brief, on an assertion in Citicorp's summary-judgment opposition brief that Citicorp's recent agreement with the MAC network provides the plaintiffs with access to cash-assistance point-of-sale transactions, and so there is no longer any live controversy.

### II. *Background.*

In 1990, Congress required the states to "implement an electronic benefit transfer system" to take the place of the paper food-stamp coupon system. 7 U.S.C. § 2016(i)(1)(A). The cost of this "EBT" system was not to exceed the of operating the paper coupon system it was intended to replace. *Id.* at § 2016(i)(2)(A).

On November 1, 1997, Pennsylvania began to establish such a computerized system and contracted with Citicorp to administer it. The system operates the same way as electronic banking does for private bank accounts that are accessible by ATM cards or debit cards. A food stamp recipient has an account in a central database and is given a "Pennsylvania Access" card and a PIN number. When purchases are made at a participating food store, the card is swiped through a terminal at the point of sale, the PIN number is entered, and the recipient's account is debited, resulting in a so-called POS (for point of sale) transaction.

The card has an additional feature. For those eligible for welfare (or cash assistance) payments, the card will allow them to access a cash-assistance account. Like food-stamp eligible purchases, purchases can be made at the point of sale and the account debited (as long as the retailer is eligible to do so under the plan). Further, the card can be used to access cash-assistance benefits at ATM machines.

Section 2016(g), in effect before the 1990 amendment required the states to convert to a computerized system, prohibits a state in subsection (2) from imposing on food retailers the cost of a computerized system for distributing food stamp benefits. Section 2016(g) reads, in pertinent part, as follows:

---

1. Greenwich Markets sold its lone supermarket after suit was filed.

(1) If the Secretary determines, in consultation with the Inspector General of the Department of Agriculture, that it would improve the integrity of the food stamp program, the Secretary shall require a state agency—

(A) to issue or deliver coupons using alternative methods, including an automatic data processing and information retrieval system; or

(B) ....

(2) The costs of documents or systems that may be required pursuant to this subsection may not be imposed upon a retail store participating in the food stamp program.

After the states were required to switch to a computerized system, the Secretary of Agriculture issued 7 C.F.R. § 274.12 (1997), a regulation dealing with the change-over. The regulation also dealt with "retailer participation" in the system. in regard to retailer costs, it provided as follows:

Authorized retailers shall not be required to pay costs essential to and directly attributable to EBT system operations as long as the equipment or services are provided by the State agency or its contractor and are utilized solely for the Food Stamp Program. In addition, if Food Stamp Program equipment is deployed under contract to the State agency, the State agency may, with USDA approval, share appropriate costs with retailers if the equipment is also utilized for commercial purposes.

7 C.F.R. § 274.12(g)(2).

When the rule was first proposed and opened to public comment, the Secretary of Agriculture explained it as follows:

Under section 7(g) of the Act (7 U.S.C. 2016(g)), the cost of documents or systems that utilize an automatic data processing and information retrieval system to enable households to purchase their food shall not, if the system is required by the Secretary, be imposed on participating retailers. Even though section 7(g) is not directly applicable to the voluntary system addressed in this proposed rule, the Department has placed reliance on the expression

of Congressional intent in that subsection. Therefore, this rule would prohibit a State agency from requiring retailers to bear costs essential to and directly attributable to an EBT system utilized solely for the Food Stamp Program. However, the State agency would not be required to pay the costs of terminals or terminal installation for retailers that choose to utilize their own terminals or terminals supplied by third party processors. As a result, retailers that choose to operate their own POS terminals or obtain terminals and other commercial electronic funds transfer services through a third party processor would be making a business decision not to utilize the EBT system's equipment.

56 Fed.Reg. 65114, 65124 (1991).

To meet its statutory and regulatory responsibility to provide a cost-free system to participating retailers, Pennsylvania is doing the following. Any retailer who wants terminals for processing food-stamp point-of-sale transactions will receive them free, and there will be no processing charge for transactions made on these terminals. However, if a retailer accepts a food stamp terminal, it will not be able to process cash-assistance point-of-sale transactions. This is true even if it has its own terminals on which such transactions could be processed and on which it processes point-of-sale transactions for private bank accounts. If a retailer wants to be able to process both food-stamp and cash-assistance point-of-sale transactions, it must acquire on its own (either by purchase or lease) the terminals to do so (what the plaintiffs have styled "commercially-purchased POS devices") and pay any processing fees a third party processor (TPP) may impose for both types of transactions. The Secretary of Agriculture has approved this approach. (*See* Houstoun's counterstatement of material facts, correspondence attached as exhibit B).

The plaintiffs' complaint arises from the alternatives Pennsylvania decided to provide. In their words, the system provided them with the following alternatives:

(1) use state-supplied POS devices to accept food stamp benefits at the checkout, forfeit the right to accept EBT cash bene-

fits at the checkout and in many cases, forfeit the right to accept food stamp benefits at all checkouts, or (2) use commercially purchased POS devices to accept food stamp and cash assistance benefits at the checkout and incur associated capital costs, TPP fees (or connection fees) and telephone charges.

(Complaint, ¶ 35).[2]

The plaintiffs allege that, as a result, they and other members of PFMA will in general suffer the following costs: if the first alternative is chosen, costs in the form of lost cash-assistance sales and "curtailed customer service," (complaint, ¶ 36); if the second alternative is chosen, costs in the form of acquiring or leasing terminals, connection fees and telephone charges. (*Id.*, ¶ 37).

The plaintiffs also allege that connecting the offer of free food-stamp terminals and processing to a prohibition on cash-assistance point-of-sale transactions was intended to coerce retailers to forgo the free machines out of fear of losing sales to customers using cash assistance. As a result, and contrary to the statute, the costs of the computerized food-stamp system will be imposed on retailers because retailers will decide not to accept the free machines and instead rely on their own terminals to process and pay for both food-stamp and cash-assistance point-of-sale transactions. (*Id.*, ¶ 47).

In support, the plaintiffs further allege that this system differs from those in other states where the state-supplied food-stamp machine may be used to process both food-stamp transactions and cash-assistance transactions, or where a state supplies a machine to process food stamp transactions and allows a retailer to process cash-assistance transactions on its own terminal. (*Id.*, ¶ 48).

For this alleged violation of the no-cost requirement, the plaintiffs requested in count I against both defendants that the court: issue a declaratory judgment that [the] EBT system violates 42 U.S.C. § 1983 and the federal food stamp statute and regula-

tions by improperly imposing costs upon retailers; to grant the appropriate preliminary and permanent injunctive relief to effectuate this declaration....

(*Id.*, pps. 13–14) (brackets added).

The Food Stamp Act also contains an anti-tying provision, 7 U.S.C. § 2016(i)(11)(B), which provides, in pertinent part, as follows:

A company may not sell or provide electronic benefit transfer services, or fix or vary the consideration for electronic benefit transfer services, on the condition or requirement that the customer—

(i) ....

(ii) not obtain some additional point-of-sale service from a competitor of the company or competitor of any affiliate of the company.

7 U.S.C.2016(i)(11)(B)(ii).

Based on this provision, the plaintiffs requested in count II against Citicorp alone that the court:

issue a declaratory judgment that Citicorp violates 7 U.S.C. § 2016(i)(11)(B) by improperly providing state-supplied food stamp only POS devices to retailers only on the condition that they not obtain point-of-sale services that would permit retailers to accept EBT cash benefits at the checkout; to grant the appropriate preliminary and permanent injunctive relief to effectuate this declaration....

(*Id.* p. 15).

As noted, the parties agreed that the first step in the litigation would be the filing of a motion for summary judgment by the plaintiffs to determine whether they had causes of action upon which they could base their claims for declaratory and equitable relief. In opposing the motion, Citicorp maintained that it had reached an agreement with the "MAC network" after Citicorp had filed its answer to the complaint. Based on this agreement and contrary to the plaintiffs' allegations concerning how the EBT system would work, Citicorp maintained that retailers who accepted free food stamp devices would be able to process cash-assistance

---

**2.** The reference to forfeiting the right to accept food stamp benefits at all checkouts in many cases is to the requirement that a food store have at least 15% of its sales in food stamps before Pennsylvania will supply a free food-stamp machine.

point-of-sale transactions, as long as those transactions were performed on the MAC network. (Citicorp's opposition brief at p. 7 and n. 4).

These new facts led the plaintiffs to argue in their reply brief that the case was now moot because the availability of free food stamp machines coupled with access to the MAC network for cash-assistance point-of-sale transactions cured the defect in the EBT system and granted them the relief they sought. The plaintiffs therefore requested that the complaint be dismissed but without prejudice to refiling it if MAC access was terminated. (Plaintiffs' response to surreply memoranda at p. 2). They also indicated that they might be seeking attorney's fees under 42 U.S.C. § 1988 because they viewed the MAC access as a response to this lawsuit.

The defendants have opposed the suggestion of mootness by arguing that the complaint sets forth claims that are not resolved by the MAC network agreement. Defendant Houstoun has also submitted an "affidavit" from Mark A. Kohr, the official with the Department of Public Welfare responsible for developing the EBT system.[3] Kohr explains how this MAC network access has come about.

Citicorp is obligated to provide to recipients of cash assistance adequate access to their accounts through point-of-sale transactions and ATM machines. (Kohr "affidavit," ¶ 9). In the course of providing this access, Citicorp contracted with the MAC network for use of its machines. MAC "is prohibited from discriminating in the level of services it provides to its participants." (*Id.*).

Thus, any retailer with a commercial POS device which accepts MAC cards (including those ... retailers who chose to receive free food stamp only POS terminals) will have the capability of processing EBT cash assistance POS transactions through their TPP *to the MAC Network* to Citibank. Such transactions are processed under MAC Network rules and fees. The MAC Network fees retailers pay, in addi-

tion to TPP fees, can include a $.07 issuer fee.

(*Id.*, at ¶ 10) (emphasis in original).

Kohr maintains that the capability for retailers who accept free food stamp machines to handle cash-assistance point-of-sale transactions through MAC was unexpected, unintended, and does no reflect any change in policy by the Commonwealth. (*Id.*, ¶¶ 11 and 13). For example, this capability allows cash-assistance recipients to access their accounts through ATM machines at race tracks and liquor stores, (*id.*), obviously undesirable consequences from the Commonwealth's viewpoint. "The Commonwealth ... is presently considering the problem, but has not changed its policies affirmatively." (*Id.*). It "reserves the right to change this access in the future." (*Id.*).

Additionally, access to the cash-assistance account is limited to connecting through MAC, which imposes an additional expense, even if a retailer has a third party processor. The MAC agreement does not allow direct access through these TPPs. (*Id.*, ¶¶ 6 and 10).

III. *Discussion.*

A. *Mootness.*

■ Federal courts will not decide moot cases because the constitution limits their jurisdiction to "cases or controversies." *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). The case or controversy requirement generally limits courts to deciding cases where they can provide meaningful relief. *Id.* "This case or controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate. To sustain ... jurisdiction ... it is not enough that a dispute was very much alive when suit was filed ... The parties must continue to have a personal stake in the outcome of the lawsuit...." *Id.* at 477–78, 110 S.Ct. at 1253–54, 108 L.Ed.2d at 410–11 (citations and quoted cases omitted) (internal quotation marks omitted).

---

**3.** The document is styled as an affidavit but is not really one. Kohr has signed it but he did not execute it under oath before a notary. Nor was it executed under penalty of perjury so that it could qualify as an unsworn statement under 28 U.S.C. § 1746.

■ Nonetheless, because mootness addresses whether a party, who once had standing, retains standing at some later time in the lawsuit, "the threshold for satisfying the prohibition against mootness is somewhat lower than that for standing." *Artway v. Attorney General,* 81 F.3d 1235, 1246 (3d Cir.1996). "The burden of demonstrating mootness 'is a heavy one,'" *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642, 649 (1979) (quoted case omitted), and falls on the party asserting it. *See Cardinal Chemical Co. v. Morton Int'l. Inc.,* 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993).

■ The standard for determining mootness has been articulated in different ways. The Third Circuit has stated that: "The central question in mootness inquiries is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Artway, supra,* 81 F.3d at 1246 (internal quotation marks, brackets and quoted case omitted). It has also stated that: "An action becomes moot when (1) there is no reasonable expectation that the alleged events will recur . . . and (2) interim relief or events have completely eradicated the effects of the violation." *Id.* (internal quotation marks omitted) (quoted case, which quoted *Davis, supra,* omitted).

■ The plaintiffs argue that the case is now moot because Citicorp's agreement with the MAC network has eliminated the aspect of the plan that the plaintiffs found offensive and from which they sought relief—the tie between acceptance of free food-stamp terminals and the refusal to allow a retailer to process cash-assistance transactions on its own terminal.

Both Houstoun and Citicorp vigorously oppose the plaintiffs' argument that the case is moot, and they seek an adjudication in their favor on the merits. To begin with, both of them have, as the plaintiffs put it, "peruse[d] the background portions of the complaint and invent[ed] claims for the plaintiffs that are not satisfied by the MAC agreement." (Plaintiffs' response to surreply memoranda at p. 4) (brackets added). We need not address the defendants, position in detail because we agree with the plaintiffs that, for the most part, the defendants have indeed created causes of action that the plaintiffs are not pursuing.

Defendant Houstoun also argues that the case is not moot because the plaintiffs did not merely complain about the lack of ability to perform cash-assistance point-of-sale transactions through the MAC network, but also complained about the restriction placed on conducting such transactions through other third party processors. Access through MAC does not solve the latter limitation. Thus, the court could still provide the plaintiffs with meaningful relief.

Additionally, Houstoun argues, as noted above, that MAC access was unexpected and unintended and that the Commonwealth is presently considering the "problem." It is reserving the right to change this access in the future. Thus, Houstoun maintains that there is a reasonable expectation that the alleged violation will recur and the case is not moot.

We need not address the second argument. We agree with Houstoun's first one. The plaintiffs can still obtain meaningful relief because a declaration in their favor would lift the restriction on cash-assistance point-of-sale transactions for third party processors, not just for the MAC network.

■ The point is more easily understood if we assume for the sake of argument that it is the defendants who are arguing mootness from the MAC agreement and the plaintiffs who desire to press their claims. (As we understand the cases, mootness analysis is not affected by which party wants the case declared moot.) In these circumstances, the case would obviously not be moot because the plaintiffs would be able to argue, correctly, that they should not be limited to the MAC network to process cash-assistance point-of-sale transactions, that they have a right to process these transactions with other third party processors as well, and that their complaint would entitle them to this relief, regardless of the availability of the MAC network.

In sum, this case is not moot and we will address the merits after first disposing of a procedural matter raised by the plaintiffs' request to dismiss.

### B. Fed.R.Civ.P. 41(a)(2).

In their reply brief, when they first requested dismissal without prejudice, the plaintiffs did not cite Fed.R.Civ.P. 41(a)(2). Both Houstoun and Citicorp have suggested that, in the absence of mootness, the plaintiffs' request to dismiss is governed by this Rule, with Citicorp briefing the standard to be applied. In their response to the defendants, surreplys, the plaintiffs agree that Rule 41(a)(2) properly applies here, and reiterate their request for dismissal without prejudice.

■ Rule 41(a)(2) provides, in pertinent part, that "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." Dismissal under this rule is within the court's discretion, and its purpose is to prevent voluntary dismissals that would prejudice opposing parties. *Shulley v. Mileur,* 115 F.R.D. 50 (M.D.Pa.1987) (Caldwell, J.). In *Shulley,* we granted dismissal without prejudice, but conditioned such a dismissal on the plaintiffs' payment of the defendants' attorney's fees in defending the action.

■ The plaintiffs have made no such offer here. Indeed, they have asserted a right to attorney's fees, based on their belief (as unlikely as it appears) that access to the MAC network was in response to this litigation. But, more importantly, the plaintiffs have not briefed their supposed entitlement to dismissal without prejudice.

In these circumstances, we will exercise our discretion to deny the motion and reach the merits. As the defendants argue, this case has been briefed and it appears that it can be decided on the summary judgment motion. And, as they also point out, there is a public interest in resolving this case so that the defendants can know how they can proceed with computerizing food-stamp benefits.

### C. Whether the Plaintiffs May Rely on 42 U.S.C. § 1983 to Assert a Cause of Action Under the No–Cost Prohibition of the Food Stamp Act.

The defendants both argue that the plaintiffs have no private cause of action to enforce 7 U.S.C. § 2016(g)(2) of the Food Stamp Act, the provision prohibiting the states from imposing on food retailers the cost of a computerized system for distributing food stamp benefits. They contend that section 2016(g)(2) is not enforceable by way of section 1983 because the Food Stamp Act's overarching purpose is to provide poor persons with nutritious food, not to benefit food retailers. They maintain that, while section 2016(g)(2) may indirectly assist retailers by setting forth a no-cost requirement, in the context of the entire law it was merely intended to insure that poor persons had access to the food stamp system. They cite in their support a leading Supreme Court case in this area, *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), and a recent decision, *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

The defendants also cite *H.E. Duncan & Sons, Inc. v. Financial Exchange Co.,* 1986 WL 9258 (E.D.Pa.), a which held that food retailers had no standing to contest a decision allowing an issuing agent for food stamps to distribute the stamps in three supermarkets, and in so doing, stated that the "primary purpose of the Food Stamp Act is to help provide a more nutritious diet for low-income households" and that the law "was not enacted for the especial benefit of retail grocers." 1986 WL 9258 at *3.

■ *Blessing* provides the framework for our analysis of this issue. There the Court stated that three factors had to be considered in determining whether a plaintiff could enforce a federal statutory provision under section 1983:

First, Congress must have intended that the provision in question benefit the plaintiff. *Wright,* 479 U.S., at 430, 107 S.Ct., at 773–774. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would

strain judicial competence. *Id.*, at 431–432, 107 S.Ct. at 774–775. Third; the statute must unambiguously impose a binding obligation the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms. *Wilder, supra,* at 510–511, 110 S.Ct. at 2517–2518. . . .

*Blessing, supra,* 520 U.S. at ——, 117 S.Ct. at 1359, 137 L.Ed.2d at 582.

The Court also advised that:

Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress "specifically foreclosed a remedy under § 1983." *Smith v. Robinson,* 468 U.S. 992, 1005, n. 9, 104 S.Ct. 3457, 3464, n. 9, 82 L.Ed.2d 746 (1984). Congress may do so expressly, by forbidding· recourse to § 1983 in the statute itself, or impliedly; by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983. *Livadas v. Bradshaw,* 512 U.S. 107, 133, 114 S.Ct. 2068, 2083, 129 L.Ed.2d 93 (1994).

*Id.* at ——, 117 S.Ct. at 1360, 137 L.Ed.2d at 582.

 With these principles in mind, it is obvious that the plaintiffs can enforce. section 2016(g)(2) by way of section 1983. First, section 2016(g)(2) is phrased in such a way that Congress must have intended that the provision in question benefit the plaintiffs. As quoted above, section 2016(g)(1) authorizes the Secretary of Agriculture to require states to issue food stamps by way of a computerized system. Section 2016(g) then reads as follows:

(2) The costs of documents or systems that may be required pursuant to this subsection may not be imposed upon a retail store participating in the food stamp program.

Because· section 2016(g)(2) specifically refers to retail stores, they are the intended beneficiaries. In *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 510, 110 S.Ct. 2510, 2517–18, 110 L.Ed.2d 455, 467 (1990), the Court held that health-care providers were the intended beneficiaries of a statutory provision requiring states to make reasonable and adequate compensation for medicaid services, even though the providers were not directly mentioned in the provision. We likewise conclude here that when a provision explicitly mentions food retailers, they also are intended beneficiaries.

Second, the right protected by section 2016(g)(2) is not so "vague and amorphous" that its enforcement would strain judicial competence. The section protects food retailers from the costs of documents or systems that a state may require in connection with a food stamp electronics benefit transfer system. This right is sufficiently discrete so that a court can readily decide whether it is being violated, and grant the appropriate relief if necessary. ·

Third, section 2016(g)(2) unambiguously imposes a binding obligation on the· states not to shift the cost of a computerized system onto food retailers. The section reads that "costs of documents or systems that may be required pursuant to this subsection *may not be imposed* upon a retail store . . . ." (emphasis added).

We note here that defendants do not argue that the Food Stamp Act explicitly forecloses a remedy under section 1983 or implicitly does so by setting forth a comprehensive enforcement scheme that is incompatible with individual enforcement under section 1983.

In reaching our conclusion that the plaintiffs can enforce section 2016(g)(2) by way of section 1983, we reject the defendants' reliance on the overarching goal of the Food Stamp Act. As *Blessing* makes clear, we must examine the particular provision or provisions at issue to determine whether a plaintiff can invoke section 1983. *Blessing, supra,* 520 U.S. at ——, 117 S.Ct. at 1360, 1362, 137 L.Ed.2d at 583, 585.

We also conclude that *H.E. Duncan & Sons, Inc. v. Financial Exchange Co.,* 1986 WL 9258 (E.D.Pa.), is inapposite. First, the plaintiffs in that case did not rely on a specific section or sections of the Food Stamp Act. In fact, they did what the Supreme Court

disapproved of in *Blessing*; they relied on the entire Food Stamp Act to justify their cause of action. Second, even the specific regulation the plaintiffs did cite, 7 C.F.R. § 274.1, was not violated by the defendants' conduct.

D. *Section 2016(g)(2)'s No–Cost Requirement For Retailers and the Defendants' Connection of Free Food Stamp Terminals to a Restriction on a Retailer's Ability to Transact Cash–Assistance Point–of–Sale Payments by Way of an EBT System.*

■ As noted, the Pennsylvania plan for implementing an EBT system for food-stamp benefits provides that any retailer who wants terminals for processing food-stamp point-of-sale transactions will receive them free and there will be no processing charge for transactions made on those terminals. However, if a retailer accepts a food stamp terminal, it will not be able to process cash-assistance point-of-sale transactions even if it has its own terminals on which such transactions could be processed and on which they process point-of-sale transactions for private bank accounts. If a retailer wants to be able to process both food-stamp and cash-assistance point-of-sale transactions, it must acquire on its own (either by purchase or lease) the terminals to do so and pay any processing fees that may be imposed.

The plaintiffs maintain that this plan violates section 2016(g)(2)'s prohibition of imposing the cost of a food-stamp EBT system on retailers. As we understand the argument, a food retailer may suffer impermissible costs in two ways, depending on the alternative chosen. If the retailer decides to accept the free terminals, it incurs the costs of forgoing cash-assistance point-of-sale transactions. If the retailer decides not to accept the free terminals, it incurs the costs of buying or leasing terminals. In the latter alternative, the retailer's fear of losing cash-assistance point-of-sale transactions is the incentive for acquiring terminals at its own expense, thereby freeing the Commonwealth and Citicorp of the financial burden of providing them.

In further support of their position, the plaintiffs point out that there is no technical reason why food-stamp point-of-sale transactions and cash-assistance point-of-sale transactions have to be connected in this negative way. The latter transactions could be processed regardless of whether or not retailers had free food-stamp terminals. In this light, Pennsylvania's plan actually defeats access to cash assistance by limiting point-of-sale transactions to the extent that retailers choose to accept free food-stamp machines.

Initially, both defendants oppose this position by relying on the Secretary's approval of the Pennsylvania plan, including the contested alternatives given to retailers. They point out that when a agency is charged with enforcement of a statute, a court must defer to the agency's interpretation of the statute if it is reasonable. *Cavert Acquisition Co. v. NLRB*, 83 F.3d 598, 603 (3d Cir.1996). "The agency's interpretation will be given controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute." *Id.* (internal quotation marks, internal brackets and quoted case omitted).

Defendant Houstoun then argues that the Pennsylvania system does not violate section 2016(g)(2) because there is no obligation at all to provide electronic transfer of cash assistance either at the checkout or elsewhere (such as at an ATM machine). Thus, the plaintiffs cannot demand that the state establish an EBT system that provides them with both free food-stamp point-of-sale transactions (through free food-stamp terminals) and cash-assistance point-of-sale transactions (through other terminals). The state is willing to provide them with the only thing federal law requires, a free food stamp machine to process food-stamp transactions without cost.

Additionally, Houstoun argues that plaintiffs' understanding of costs is too broad. She maintains that retailers have always incurred some costs in connection with accepting food stamps, if only for handling them. Thus, the real complaint is not about costs but about the restriction on cash-assistance point-of-sale transactions if free food-stamp machines are accepted.

Defendant Citicorp argues that the Pennsylvania system is a permissible implementation of section 2016(g)(2), as understood and interpreted by the Secretary in light of the requirement that states incur no additional costs in shifting to a computerized system. Under that interpretation, and echoing Houstoun's position, retailers have never enjoyed a truly no-cost food-stamp system. In this light, and to further a legitimate state interest in achieving "cost neutrality" in the change-over, a state could satisfy its obligation under section 2016(g)(2) by offering free food-stamp machines to retailers who limit themselves to processing food-stamp point-of-sale transactions. Citicorp maintains, in fact, that section 274.12(g)(2) only requires a state to pay for food-stamp terminals and transaction costs if the state requires use of the machines.

Citicorp also argues that the negative connection between food-stamp and cash-assistance transactions recognizes the business reality that food retailers do install their own terminals to process MAC, debit and credit transactions for customers who are not using public benefits. Thus, the restriction requires a retailer to make a business decision about the importance to it of cash-assistance point-of-sale transactions (transactions, as noted, which the Commonwealth has no duty to provide at no cost). A decision that it wants to conduct these transactions is a decision not to take advantage of the state's offer of free food-stamp machines.

Additionally, Citicorp maintains that, in any event, the EBT system will reduce the cost to retailers of handling food-stamp transactions, such costs as collecting, counting, bundling and delivering the coupons to a bank. These costs were never reimbursable. Hence, the plaintiffs are irrationally complaining about a system that reduces current costs.

Finally, Citicorp emphasizes, like Houstoun, that any retailer that wants a free food-stamp machine can have one and transact food-stamp point-of-sale transactions at no cost. Since no costs are incurred, this satisfies the statute and regulations.

In reply, the plaintiffs point out that they are not asking for cash-assistance point-of-sale capability, only that this capability not be tied to forgoing their right under section 2016(g)(2) not to have to incur costs to participate in the food-stamp program. Additionally, they contest Citicorp's assertion that costs will be lower under the EBT system.

We reject the plaintiffs' position. The Secretary's interpretation of section 2016(g)(2) is reasonable and also takes into account the limitations on the costs the Commonwealth can incur for the change-over; the state cannot implement a computerized system if the costs would exceed the old paper system. We also believe that the Pennsylvania plan properly recognizes that the acquisition of a terminal will involve business decisions greater than just a decision to process food-stamp benefits. If a retailer decides that it wants to process more than just those benefits, the Commonwealth could reasonably decide, in order to be cost effective in the change-over, that it need not supply free food-stamp terminals.

We acknowledge that the state could have done things differently, for example, by combining food-stamp and cash-assistance transactions on the free food-stamp terminal and charging the retailer for the latter transactions. However, it did not have to do so, and the choice it made was a reasonable one under the statute and regulations.

E. *The Antitying Provision of the Food Stamp Act.*

As quoted above, the Food Stamp Act provides, in pertinent part, as follows:

A company may not sell or provide electronic benefit transfer services, or fix or vary the consideration for electronic benefit transfer services, on the condition or requirement that the customer—

(i) ....

(ii) not obtain some additional point-of-sale service from a competitor of the company or competitor of any affiliate of the company.

7 U.S.C. § 2016(i)(11)(B)(ii).

In count II of their complaint, the plaintiffs allege that Citicorp violates this section by tying the receipt of free food-stamp EBT

service to not receiving cash-assistance service at the point of sale.

In opposition, Citicorp points out that it is a subsidiary of a bank holding company. (Citicorp's counterstatement of undisputed facts, affidavit of Brian Claire, ¶ 2). As such, the antitying provision does not apply to it because it is excluded by section 2016(i)(11)(A)(ii) which provides, in pertinent part, that the term "company ... shall not include a bank, a bank holding company, or any subsidiary of a bank holding company."

Citicorp also argues that it does not violate the antitying provision in any event because if a retailer refuses the free-food stamp terminal, it will provide the retailer with a list of vendors, none of which is related to Citicorp. (*Id.*, ¶¶ 6 and 7). Thus, it does not require food retailers to forgo services from competitors.

In reply, the plaintiffs argue that Citicorp "fails to point out" that banks are subject to the antitying provision of the Bank Holding Company Act. 12 U.S.C. §§ 1971–1978. This provision is substantially similar to the Food Stamp Act's antitying provision. Hence, if Citicorp is a bank, it is subject to the antitying provision of the Bank Holding Company Act. Additionally, if Citicorp is not a bank, its subcontractor on the Pennsylvania system, Lockheed Martin, is subject to the antitying provision of the Food Stamp Act.

We note that the reason why Citicorp failed to refer to the Bank Holding Company Act is that the plaintiffs' claim was under the Food Stamp Act. For this reason alone, we reject the plaintiffs' position and conclude that count II has no merit. We also note that not only is Lockheed Martin not a party to this litigation but that plaintiffs have not set forth how it could be liable.

### F. *Conclusion.*

In light of our analysis, the plaintiffs' anticipated motion for attorney's fees would be unsuccessful. It also appears that there is no need for the conference requested by Houstoun's lawyer in her letter, dated December 19, 1997, since the factual issues that would have been explored (related to attorney's fees and mootness on the merits) have themselves been mooted by our disposition.

In opposing the plaintiffs' motion for summary judgment, Houstoun has requested that we issue declaratory relief in her favor that Pennsylvania's EBT system does not violate any federal statutory or regulatory law. We will grant that request and issue an appropriate order.

### ORDER

AND NOW, this 21st day of January, 1998, it is ordered that:

1. The plaintiffs' motion for summary judgment (doc. 15) is denied.

2. Defendant Houstoun's request that we issue declaratory relief in her favor is granted.

3. It is declared that Pennsylvania's EBT system does not violate any federal statutory or regulatory law.

4. All outstanding motions are dismissed as moot.

5. The Clerk of Court shall close this file.